**WHEALTON et al. v. UNITED STATES.**
No. 6897, 6898, 6901.

Circuit Court of Appeals, Third Circuit.
June 29, 1940.

Frederic M. P. Pearse and Max Mehler, both of Newark, N. J., for appellants.

John J. Quinn, of Trenton, N. J., for appellee.

Before MARIS, BIDDLE, and JONES, Circuit Judges.

JONES, Circuit Judge.

The appellants were tried in the court below upon an indictment of fifteen counts, fourteen of which charged them and others with having devised a scheme to defraud and with the use of the mails to carry such scheme into effect in violation of Sec. 215 of the Criminal Code, 18 U.S. C.A. § 338, the fifteenth count charging the defendants with conspiracy to devise a scheme to defraud and to use the mails to carry such scheme into effect in violation of Sec. 37 of the Criminal Code, 18 U.S.C.A. § 88.

After dismissing five of the mail fraud counts, the court submitted the case to the jury upon the remaining counts of the indictment as to the three appellants and two of the other defendants, namely, one Hartman, an officer of the appellant Commonwealth Trust Company, and Whealton Company, Inc. The jury found the defendant M. Frank Whealton guilty of the thirteenth count, charging a mail fraud, and also guilty of the conspiracy charge in the fifteenth count but not guilty as to all other counts in the indictment. Coffin and the Commonwealth Trust Company were found guilty of the conspiracy charge but not guilty on all other counts. These three defendants are the present appellants. Hartman was found not guilty, and Whealton Company, Inc., which was found guilty of four of the mail fraud counts and also of the conspiracy count, did not appeal.

The scheme to defraud alleged in the indictment consisted of the defendants' inducing certain persons, by means of false

and fraudulent promises and representations, to send money, securities or other property to the defendants for the purchase from the latter of securities known as "Trusteed Diversified Royalty Trust Certificates". The trust certificates represented participating interests in a pool of rights to oil royalties in the mid-continent field, and particularly in Oklahoma. The rights were evidenced by deeds which the Whealton Company purchased and placed in the hands of the trustee. The latter issued the participating certificates upon valuations for the deeds arbitrarily fixed by the Whealton Company. The appellant Whealton first carried on his operations through a partnership consisting of him and his brother J. C. Whealton (a defendant not on trial) under the firm name of Whealton & Company. Later, a Pennsylvania corporation was formed, known as Whealton Company, Inc., to which the assets and business of the partnership were turned over. The Commonwealth Trust Company, of Wilmington, Delaware, was the trustee of the oil royalties.

The Commonwealth Trust Company agreed to receive from Whealton & Company the deeds for oil royalties and to hold them for the benefit of the purchasers of the certificates which the Trust Company would issue from time to time for sale by Whealton & Company. The latter guaranteed a return of 8% per annum on the certificates, payable monthly, and a redemption of the certificates, at the option of the trustee, at the rate of $115 and a nonredeemable $50 income certificate for an original $100 certificate.

Whealton, his brother and one Mallette (a defendant not on trial) incorporated, and thereafter controlled, three separate companies in Oklahoma for use in the purchase of royalty deeds and in carrying out the operations of the defendants. Royalty deeds were purchased and deposited with the Commonwealth Trust Company at a value placed upon them by Whealton & Company in intended excess of the prices paid for them.

Various pools of oil royalty deeds having been set up by Whealton & Company with the Trust Company for which certificates were issued by the latter for sale by Whealton & Company and its associates, the defendants sent out to prospective purchasers of trust certificates letters and circulars in furtherance of the scheme, which, known to the defendants, contained false and fraudulent promises and representations with respect to the worth of the certificates as investments.

As charged in the indictment, it was a part of the defendants' scheme to have the Trust Company issue false statements with respect to the certificates, which the Trust Company did. And, it is also charged that the Trust Company issued certificates whenever called upon by Whealton & Company so to do without regard to the "named value" of the properties pledged in support of a particular series of certificates; that the defendants, through the three Oklahoma corporations, furnished the Trust Company with the funds necessary for the income and redemption requirements of the certificates; and that the moneys used for that purpose were supplied by Whealton & Company to the Oklahoma corporations out of receipts from the sale of certificates which, less the expense of sale, should have been devoted to the purchase of oil royalties.

The indictment also charges that, in order to induce confidence in the certificates, the defendants would have purchasers, actual or prospective, make inquiry of the Security Division of the Attorney General's office of New Jersey as to the value of the certificates and that Coffin, one of the appellants, then a special Assistant Attorney General, would, according to prearrangement with the defendants, send letters in response to such inquiries which were falsely favorable to the certificates.

In addition to the oil royalties and the participating certificates already mentioned, the defendants also sold units of interest in an oil lease of three hundred and fifty acres of land in Oklahoma known as the "Davis-Stinnett Lease". This lease, the defendants had purchased for $19,000, whereupon they capitalized it at $616,000 and divided the rights under the lease into twenty-eight hundred units of interest which they sold to purchasers at from $200 to $250 per unit. Fourteen hundred of these units were to bear interest at the rate of $3 per month. The defendants represented that they would operate wells on the Davis-Stinnett Lease and that, by repressuring methods, they would recover large quantities of oil, whereas the possibility of producing oil from the lease in sufficient quantity to return an income of $3 per month per unit on fourteen hundred of the units was entirely speculative. In order to lull purchasers of these units, the

defendants paid $3 per month per unit "out of moneys actually received from the sale of said units".

In addition to the foregoing, the thirteenth count of the indictment upon which the appellant Whealton was convicted alleges that Whealton, as president of Whealton Company, Inc., on October 23, 1934, for the purpose of executing the scheme and artifice to defraud, caused a certain letter addressed to Albert E. Levy, of Margate City, New Jersey, to be delivered by mail by the Post Office establishment of the United States, according to directions thereon, the envelope containing an official report which had been received by Whealton Company, Inc., from the Commonwealth Trust Company, the trustee, relative to a particular series of certificates.

The evidence adduced at trial supported a finding that the issuance and sale of the participating oil royalty certificates and the units based upon the Davis-Stinnett Lease amounted to a fraud upon the purchasers thereof which was known, and intended, so to be by those engaged in the furtherance of the scheme. But the questions with which we are here concerned are (1) whether the use of the mails to carry out the scheme to defraud, as the indictment charges, was competently proven and (2) whether a conspiracy to devise the scheme to defraud and to use the mails to carry it into effect was properly established as to any or all of the three appellants convicted of the charge. These questions involve the very matter from which federal jurisdiction to punish the fraud derives.

■ Whealton contends that his mailing of the letter to Levy (Ex. G-408) was not competently established. This goes directly to the basis of the crime alleged. The statute, Title 18 U.S.C.A. § 338, provides in material part that: "Whoever, having devised * * * any scheme or artifice to defraud, * * * shall, for the purpose of executing such scheme or artifice * * * place, or cause to be placed, any letter * * * in any post office, * * * to be sent or delivered by the post office establishment of the United States, * * * shall be fined * * * or imprisoned * * * or both." It is plainly evident from the statute that the mailing in furtherance of the fraud is the crux of the crime declared therein. Necessarily, therefore, the mailing in furtherance of the fraud must be proved before a conviction can be had or sustained. The proof need not be direct. It may be circumstantial. Freeman v. United States, 3 Cir., 20 F.2d 748, and cases there cited at page 750. But, the circumstances proven must be such as will directly support an inference of the fact to be established so as to exclude all reasonable doubt to the extent of overcoming the presumption of innocence. United States v. Baker, 2 Cir., 50 F.2d 122. Nor can an inference essential to the establishment of the crime be rested upon another inference. Brady v. United States, 8 Cir., 24 F.2d 399, 404; United States v. Ross, 92 U.S. 281, 283, 23 L.Ed. 707.

■ Levy, the addressee of the letter (Ex. G-408), who was called by the government as a witness, testified to his purchase of several of the oil royalty certificates from a brother of the appellant Whealton. He also testified that he received the letter in the mails. The envelope which contained the letter and enclosed the circular was not offered in evidence or produced at trial. From the fact that Levy received the letter it was necessary to infer that it had been mailed; and from the inference that it had been mailed it was necessary to infer that Whealton had mailed it or caused it to be mailed. There was no proof independently supporting the latter inference. Levy's testimony as to his receipt of the letter is as far as the evidence goes with respect to Whealton's alleged mailing of the letter. That was not sufficient. Freeman v. United States, supra. In the Freeman case, in addition to proof of the addressee's receipt of the statement in the mails, it was also proven that the one charged with having mailed it had signed the statement. But, in the present case, it was not proven that Whealton signed his name which appears on the letter received by Levy. The government contends that Whealton's signature to the letter was admitted. But, as we read the colloquy at trial between counsel and the court, as disclosed by the record, with respect to the admission of the genuineness of a signature to an exhibit, the exhibit then under consideration was not the letter to Levy. However, even had the signature been admitted, proof of Levy's receipt of the letter and Whealton's signature would not sustain a finding that Whealton had mailed the letter or had caused it to be mailed. Freeman v. United States, supra. There must be proof, either

714

direct or circumstantial, of mailing by someone.

■ In an effort to supply circumstances which would support an inference that Whealton had mailed the letter to Levy, the government offered proof to show the practice or custom in the office of the Whealton Company with respect to mailing letters originating therein and that Whealton was dominant in the direction of the affairs of the company. The government contends that these facts, together with the fact that the letter was on the letterhead of the Whealton Company, that the letterhead showed Philadelphia as the company's place of business, and that the exhibit itself indicated that it was in response to a letter then recently received by Whealton from Levy, justified an inference that Whealton had mailed the letter or caused it to be mailed. But, the proofs offered to show the practice or custom of the office with respect to mailing outgoing letters fell far short of proving any custom, and the attempt was finally abandoned by the government. Moreover, the remaining facts relied upon by the government do not preclude the necessity of drawing an essential inference from other inferences, which is not permissible. Brady v. United States, supra; United States v. Ross, supra. In the case of Levinson v. United States, 6 Cir., 5 F.2d 567, 569, cited by the government, it was not only shown that the one charged with having mailed the letter was dominant in the affairs of the company, but that he "carried on all of its correspondence". The proofs did not so disclose in the instant case. In Greenbaum v. United States, 9 Cir., 80 F.2d 113, it was said, at page 125, that: "A signature of an employee plus the company's letterhead, together with proof that the letter was mailed by some one, is sufficient in this respect", that is, as to the evidence necessary to show "a mailing of the indictment letter by the defendants or their agents to warrant consideration by the jury". Here there was no evidence of the mailing of Exhibit G-408 by anyone nor were circumstances directly proven from which such an inference might be drawn. We are therefore of the opinion that the evidence in the record is insufficient to support a finding of the mailing of the letter (Ex. G-408) and that the defendant Whealton's conviction on count 13 of the indictment cannot be sustained.

■ Coming to the conspiracy count, each of the appellants contends that the trial court erred in failing to direct a verdict of acquittal either at the close of the government's case or at the conclusion of the trial. This contention rests mainly upon the assertion that the evidence was insufficient to support a finding of appellants' guilt of the conspiracy charge. After a careful examination of the voluminous record which is before us in the original transcript, we are of the opinion that the competent evidence was sufficient to support the verdict of guilt on the fifteenth count of the indictment. It is true that some of the evidence, when considered separately, is of slight probative value. But, when taken in conjunction with other proven facts in the case, it was properly matter for the jury's consideration. For instance, Coffin's subsequent change of attitude toward the so-called Whealton securities from what it had been when he was first called upon to investigate the issue in his capacity as an Assistant Attorney General was properly for the jury as confirmatory of Coffin's having enlisted in Whealton's undertaking, which other facts tended to establish. His responses to letters from persons inquiring of the Security Division of the New Jersey Attorney General's office with respect to the worth of the trust certificates went further than the discharge of his official duties required. His actions in such regard virtually amounted to salesmanship in behalf of Whealton's scheme. While disclaiming any right or intention to express an opinion as to the value of the trust certificates, Coffin's responses gave facts from which an inference favorable to the certificates as investments was substantially impelled; and he must have known that there was nothing to justify the facts which he thus affirmed. Likewise, his letter to the Whealton Company (Ex. G-11), which was written three months after he had left the Attorney General's office and had become counsel for the Whealton Company, made inquiry whether he was not entitled to a bonus upon an account which he said he was instrumental in opening. His activity in that connection (a favorable response to the particular purchaser's inquiry with respect to the trust certificates) had been exerted three months before he left the Attorney General's office. The letter tended to show his association with Whealton in promoting the sale of the certificates at that early date. The testimony of the witness Dooner is of like importance. Dooner testified that, upon his inquiring of Coffin, while the latter was still

Assistant Attorney General, as to the value of trust certificates, Coffin told him that he considered them "a very good investment" and that Dooner should "get rid of * * * [his] guaranteed mortgages". As to Whealton and the Commonwealth Trust Company, the competent evidence justified a finding of their participation in a conspiracy to devise a scheme to defraud and to use the mails to carry the scheme into effect. However, we shall not particularize further with respect to the sufficiency of the evidence, whereof one or more of the appellants complains, as in our opinion there was evidence improperly admitted to the prejudice of the appellants which requires a reversal of the judgments of conviction.

■ Following a trip to Oklahoma by Whealton and two of his company's salesmen, Turner and Lipsey (also defendants not on trial), where the latter learned of Mallette's wrongful diversion of proceeds from the Whealton sale of certificates, Turner and Lipsey reported their information to Coffin. Thereupon, at a meeting at Coffin's office at which Whealton, Turner, Lipsey, Barcus (a defendant who plead guilty and appeared as a government witness) and others were present, Coffin dictated a statement which he signed and which was offered by the government as Exhibit G–8. In the part relied upon and utilized by the government at trial, Coffin said: " * * * I do not condone any of the offenses nor by the same token do I excuse what may appear to be compounding a felony * * *." Over objection of Coffin's counsel, the exhibit was received in evidence as to Coffin alone. In no permissible view, was the exhibit competent as evidence against anyone. It contained no facts relevant or material to the establishment of the crime charged. It merely implied a legal conclusion of Coffin without reciting the facts whereon the conclusion was based. At best, it was no more than an opinion and therefore incompetent as a matter of evidence. Yet, the jury might well have considered the statement to be a confession of the commission of "offenses" to which Coffin had theretofore been a party. What the "offenses" were, the statement does not disclose, nor did it afford any means for testing the validity of the implied opinion.

■ The possibility of harm from the improper admission of Exhibit G–8 was substantial, not only as to Coffin but as to Whealton and Commonwealth Trust Company as well. True enough, the exhibit was not admitted in evidence against Whealton and Commonwealth Trust Company, nor could it have been under any circumstances. The exhibit was not only incompetent, being no more than an implied conclusion, but, even if the conspiracy still endured, the statement could hardly be considered as having been made in furtherance of the scheme to defraud alleged in the indictment. It is the acts or declarations of a conspirator done or made for the purpose of effecting the common object of the conspiracy which are binding upon his co-conspirators. Hyde v. United States, 225 U.S. 347, 32 S.Ct. 393, 56 L.Ed. 1114, Ann. Cas.1914A, 614; Minner v. United States, 10 Cir., 57 F.2d 506; Van Riper et al. v. United States, 2 Cir., 13 F.2d 961; Murray v. United States, 7 Cir., 10 F.2d 409. While the limitation of the admission of the exhibit as to Coffin fixed the extent of its legal purview with respect to the several defendants, it is impossible to believe that its effect could be so discriminatingly limited in the minds of the jury. The really practical effect of the improperly admitted exhibit was to predispose the jury to belief in the defendants' guilt because of Coffin's implied opinion that "offenses" had been committed. It was the jury's duty to draw the conclusion of the defendants' guilt or innocence from the competent, relevant and material testimony in the case and not from unsupported opinions of anyone. The failure to exclude Exhibit G–8 rendered the jury's proper discharge of its duty improbable.

■ What we have herein said with respect to the impropriety of Exhibit G–8 as evidence against any of the defendants applies equally to Exhibit G–313, a further statement dictated by Coffin, in which he said that it was his duty "to go to the criminal authorities and report the facts, so that the officers and directors of the corporation could be prosecuted". As before, this exhibit was admitted in evidence, over objection, only as to Coffin. The court cautioned the jury that opinions expressed by Coffin in the statement with respect to the guilt of other defendants was not evidence against them. But, the harm was done by the admission of the incompetent evidence and no amount of caution could take the sting of its implications from the minds of the jury. This statement spoke of "facts" but recited none. It likewise represented

no more than Coffin's opinion and was not competent as evidence against anyone including himself.

■ When the affairs of the Whealton Company had become a matter of serious concern and discussion among those engaged therein, and apparently because of Coffin's imputation that "offenses" had been committed and that the "officers and directors" of the company should be prosecuted, one Alexander (a defendant not on trial) insisted upon and received from M. Frank Whealton a signed statement (Ex. G–275) in intended exculpation of Alexander. The statement in material part reads as follows: " * * * Alan W. Alexander never authorized nor had any knowledge of nor anything to do with any payments, advances, or transfers of funds made by Whealton Company, Inc. to either Carl Whealton and/or R. L. Turner and/or J. C. Lipsey and/or P. L. Coffin, Jr. and/or the undersigned. And furthermore, if any moneys were paid, advanced, or other assets transferred to any of the above individuals improperly, said Alan W. Alexander was entirely ignorant of such payments, advancements, or transfers." This exhibit was received in evidence, over objection, as to Frank Whealton only. It was, obviously, evidence of nothing against anyone and should have been excluded. It had no probative effect whatsoever as to any fact relevant or material to the issues of the case. Yet, the government in its brief upon quoting as above from the statement says that it contains "reference to improper payments made to Coffin". The fact is that the statement makes no reference to improper payments having been made to anyone. It does imply that payments may have been made to one or others of those named therein but immediately adds that "if any moneys were paid, advanced, or other assets transferred to any of the above individuals improperly", Alexander was ignorant of it. When government counsel can draw from this erroneously admitted exhibit an inference of improper payments to Coffin against whom the exhibit was not in evidence and who was not even present when the statement was made, it is not unreasonable to conclude that the jury was likewise misled.

■ The government called Mallette as a witness in rebuttal, ostensibly, to impeach Whealton's credibility. But Mallette's particular testimony, to which the defendants duly objected, was not rebuttal and should have been excluded, particularly in view of the prejudicial nature of the matter involved in the alleged contradiction. In cross-examination of Whealton as a witness for the defense, government counsel handed him an exhibit (48 for identification) which was an audit of Whealton Company, Inc. (later offered in evidence as Exhibit DW61). Referring to a schedule which was a part of the exhibit, counsel for the government directed the witness, Whealton, to "examine the schedule marked 'Analyses, Legal Expenses', and state when for the first time you paid Mr. Coffin any money". The witness was thus virtually restricted in his testimony to what the schedule disclosed, and he answered "On the 2d of July, 1934", which is what the schedule showed. The witness was not even asked whether he had not paid Coffin money before July 2, 1934, nor was he asked whether he had not told Mallette or anyone else that he had paid Coffin money before that date. Yet, the government offered, as rebuttal, Mallette's testimony that Whealton had told Mallette in April of 1934 that one Boswell (not elsewhere appearing in the case and not otherwise identified) had demanded $1,500 of Whealton for payment to Coffin or the latter would send out letters to certificate holders derogatory to the certificates and that Whealton said that he had then paid Coffin $500.00. The basis for this attempt at refutation had not been laid and the Mallette testimony in such regard should have been excluded. It was not only objected to when offered but motions to strike out were made and overruled after it had been received. The error herein was particularly harmful. Nor did the harm lie alone in the inconclusive effort to impeach Whealton's credibility. It lay rather in the stigmatizing effect of the substance of Mallette's testimony. The court, of course, warned the jury that the testimony was not substantive proof against Coffin. Nevertheless, it is not likely that the jury could eradicate from their minds the substantive effect of this hearsay as to Coffin and use it only to determine whether Whealton did tell Mallette what the latter said Whealton had told him. The Mallette testimony not being substantive proof against Coffin, the latter's mouth was closed with respect thereto. It was not permissible for him then to take the stand to deny the verity of what Whealton was supposed to have

told Mallette. True or untrue, the only issue was whether Whealton had so stated to Mallette, and even that issue was not in contradiction of Whealton's testimony on cross-examination with respect to what Exhibit 48 (DW61) showed. If Mallette's testimony was to be offered as the statement of a conspirator binding upon himself and his co-conspirators, it should have been offered in the government's case in chief whereby the defendants on trial would have had an opportunity to meet it directly and timely. It was a part of the government's theory that Whealton had paid Coffin money for services in connection with the issuance and sale of the certificates while Coffin was an Assistant Attorney General. Coffin left his position in the Attorney General's office on June 1, 1934. The significance of Mallette's testimony to the government's theory is apparent, and the harm to the defendants from its erroneous admission as rebuttal is equally plain.

■ In view of our conclusion that the judgment of conviction cannot stand because of the errors to which we have referred, it is unnecessary for us to discuss other trial errors assigned by the appellants, except for one further matter. The Commonwealth Trust Company contends that the verdict of guilty as to it should be set aside on the ground that the verdict of its guilt was inconsistent with the jury's verdict otherwise. The jury acquitted Hartman, the officer of the Commonwealth Trust Company, who according to the testimony had the control and direction of Whealton matters for the Trust Company. Apparently, it was not consistent for the jury to acquit Hartman and convict his company when the acts of the company for the most part were the acts of Hartman. However, there is some evidence in the record that action on behalf of the Trust Company with respect to Whealton affairs was taken without direction or control from Hartman. Mrs. Benson, the head bookkeeper, who was also secretary-treasurer and trust officer of the Trust Company, was persistent in her denials that she ever acted in a supervisory capacity. But we believe that the record justifies a finding that some of the Trust Company's services for Whealton were performed independently of directions or supervision by Hartman. We would not be justified, therefore, in directing that the verdict as to the Trust

Company be set aside on the ground of its inconsistency with the verdict in general.

The errors which we have heretofore discussed so permeated the case as to call for a reversal of the judgments with respect to all three appellants.

The judgment of the District Court in each of the appeals at Nos. 6897, 6898 and 6901 is reversed and the case remanded for a new trial.

BIDDLE, Circuit Judge, took no part in the consideration or decision of this case.