Wilson H. WALTERS, Charles P. Cain and Keith Terry, Appellants,

v.

UNITED STATES of America, Appellee.

No. 15483.

United States Court of Appeals Ninth Circuit.

April 11, 1958.

Rehearing Denied June 26, 1958.

Paul Stocker, Max Kosher, Everett, Wash., Kenneth MacDonald, Seattle, Wash., for appellants.

William B. Bantz, U. S. Atty., Riner E. Deglow, Spokane, Wash., for appellee.

Before FEE and HAMLEY, Circuit Judges, and SOLOMON, District Judge.

JAMES ALGER FEE, Circuit Judge.

From a conviction of the crime of violating the fraud provisions of the Securities Act of 1933,[1] the Mail Fraud Statute[2] and for conspiring to violate these statutes,[3] each of defendants appeals. All defendants contend that the evidence against each severally was not sufficient to convict. They claim that the government failed to prove criminal intent on the part of any defendant, that it was error to allow consideration of certain misrepresentations alleged, that the testimony of the wife of one of defendants was competent substantively, that the trial court did not give an adequate instruction relating to good faith and that an instruction that later efforts to avoid detection of a scheme to defraud might be a material part of the original scheme was erroneous.

Appellants were jointly indicted with one Jensen. All pleaded not guilty. After the commencement of the trial and after several witnesses had testified, Jensen entered a plea of guilty to counts charging mail fraud and conspiracy. Thereafter, Jensen testified for the government.

The remaining counts were dismissed against Jensen after the trial. Walters was found guilty on all counts and was sentenced to one year and six months' imprisonment; Cain was convicted on mail fraud, sale of securities fraudulently, and conspiracy, and not guilty on the others. He was sentenced to eight months' imprisonment on one mail fraud count, and imposition of sentence was postponed as to the others. Terry was found guilty of all counts except one relating to mail fraud. He received a three months' sentence on another count of mail fraud. Imposition of sentence was postponed as to all other counts.

The indictment is not challenged. It sets forth an elaborate scheme to defraud by sale of securities and use of the mails, and alleges all defendants conspired to commit these crimes.

■■ The chief defense is that appellants acted severally and in good faith. There are, as is usual in these cases, certain expressions of the witnesses which might be a basis for such a conclusion. But, obviously, good faith is an operation of the mind of the individual and can be proven only by inference.[4] The voluminous record contains adequate evidence of criminal intent as to each appellant. Walters did not testify. Cain and Terry did. The jury found the existence of a criminal intent upon the part of each. This finding is conclusive unless there were no evidence upon which it could be based or there were error of law. The

---

1. 15 U.S.C.A. § 77q(a) (1).

2. 18 U.S.C.A. § 1341.

3. 18 U.S.C.A. § 371.

4. Marshall v. United States, 9 Cir., 146 F.2d 618, 620, 157 A.L.R. 241; Deaver v. United States, 81 U.S.App.D.C. 148, 155 F.2d 740, 744–745, certiorari denied 329 U.S. 766, 67 S.Ct. 121, 91 L.Ed. 659.

evidence is sufficient as to each of the defendants, and will not be reviewed in detail.

All the defendants were experienced in the insurance business and advised as to the requirements of the insurance laws of Washington. The persons to whom the stock was sold were generally laymen uninformed of these matters. The existence of a uniform pattern of misrepresentation used by all defendants is patent. There is substantial evidence that each of defendants knew that the statements made to prospective investors were false. Of course, the appellants Cain and Terry denied this, and all appellants produced evidence to the contrary, but the question was for the jury. The record shows each of appellants profited substantially over the period while the operation lasted.

A brief résumé of the evidence as to the plan may be of value in understanding the contentions. Walters conceived the idea of taking over an existing "broken down insurance company" and using this shell to raise money for the purpose of financing a new insurance agency to sell insurance to motels at a reduced rate and to provide a surplus for the broken down company. The desired instrument was found by Walters in Washington Insurance Company (Mutual), of which Jensen was president. Walters, Cain and Jensen discussed the formation of a new insurance company and abandoned the idea because of the drastic provisions of Washington state law. Thereupon, at the insistence of Walters, a complicated agreement, never shown to any investor so far as the record shows, was drawn up and executed by Walters, Cain and Jensen, to raise sufficient finances to put Washington Insurance Company (Mutual) "in good shape." By its terms, there would be sold to the public $25,000.00 of surplus certificates previously authorized to permit that company to obtain additional reserve capital and $30,000.00 of outstanding surplus certificates issued by that company to a corporate agency thereof. Walters and Cain enlisted Terry

upon the possibility of allowing him to get promotional stock in the proposed agency company. Later he saw the agreement above referred to. Jensen explained to Terry, as he had previously to Walters and Cain, the limitations on writing insurance on motels. Walters drew up a sales kit, and Cain and Terry made most of the sales. The campaign was successful, partially at least owing to untrue representations made by Cain and Terry to prospects. When the supply of surplus certificates had been sold, Walters, Jensen and Terry determined not to give the money back to investors, and to continue the sale of unauthorized certificates. Terry suggested they could pick up the surplus certificates and give the investors receipts to be held until the stock should be issued. The Washington Insurance Department commenced an investigation. After that date, there were no more sales of surplus certificates, but the evidence shows strenuous efforts to conceal the unauthorized sales by Terry and Jensen, and the latter also performed a bookkeeping operation to conceal the oversale from the examiners.

The fraudulent misrepresentations and omissions related to the pretended approval of the adventure by the Washington Insurance Commissioner, the financial advantages of investing in the surplus certificates, the personal sacrifices of former positions and financial obligations of the salesmen in personally investing in the company. The evidence clearly showed the making of such representations and omissions, and also demonstrated these were made falsely and recklessly and in pursuance of a preconceived plan and design.

■ Appellants contend that the instructions did not adequately cover the defense that all their actions were in good faith. The court charged the jury on this subject in part as follows:

"Good faith on the part of a defendant is a defense, and the prosecution must prove beyond a reasonable doubt that each defendant was

not acting in good faith. Otherwise he is not guilty."

and

"False representations, pretenses, and promises, within the meaning of the law, mean any representations regarding present or past facts, any opinions expressed by defendants, and any predictions or promises as to the future not made in good faith * * *."

and in another portion of the charge:

"There can be honest, though mistaken, judgment of the future from existing conditions; even sincere but visionary optimism is allowable * * *."

and further:

"Ordinarily, fraud cannot be predicated upon promissory statements or promises of what will occur or is likely to occur in the future. A mere promise or prophecy will not support an action for fraud, but promises and representations regarding a future event with fraudulent intent to deceive and without the intention of performing them at the time they are uttered are fraudulent. Opinions and beliefs are not fraudulent.

"If any of the defendants made promises and predictions of future events which were glowing, spectacular, and grandiose, the test is whether or not he actually believed them at the time they were uttered. If he believed them at the time they were uttered, they were not fraudulent, but if he believed in his own mind that they would not materialize, or if they were made recklessly without knowledge of the facts and with intent to deceive, then the representations were fraudulent."

and in addition, in the instruction relating to the charge of conspiracy:

"If the prosecution fails to establish one or more of these elements from the evidence beyond a reasonable doubt, then you should acquit the defendant of the charge of conspiracy as to the particular defendant under consideration.

"To conspire means to participate willfully and purposely in the agreement with specific intent to violate the law or reckless disregard as to whether participants act in violation of law, so that a person intentionally encouraging, advising, or assisting other conspirators for the purpose of furthering their enterprise or scheme, with understanding of its lawful character, becomes a willful participant in the conspiracy.

"The charge of conspiracy involves an evil mind and a wrongful intent. The purpose of the conspiracy statute is to protect against forming an agreement to intentionally defraud others, and if a defendant acted in good faith and had an honest belief in the work in which he was engaged and in any statements which he made, he was not guilty of the crime of conspiracy."

Moreover, the court specifically charged the jurors that they "should consider the court's instructions as a whole and not place special emphasis on any part of them." No exception was taken to the charges above set out. The instructions, read as a whole, are adequate on the defense of good faith.

■ It is also objected that the trial court erred in giving the following instruction:

"A scheme to defraud may well include later efforts to avoid detection of the fraud. Avoidance of detection and prevention of recovery of property fraudulently obtained may be a material part of an illegal scheme."

But the instruction was correct as a matter of law if applicable to the facts.[5] The record in this case clearly shows there were efforts to conceal the sale

---

5. "Avoidance of detection and prevention of recovery of money lost by the victims are within, and often a material part of, the illegal scheme." United States v. Riedel, 7 Cir., 126 F.2d 81, 83.

of surplus certificates, and there is evidence from which the jury might well conclude that each was a participant therein. Besides, there is proof of the existence of a conspiracy, and each person shown to be a party thereto is bound by all the subsequent acts of any co-conspirator until he has proved by affirmative action that he has severed himself therefrom.

■ There was sufficient basis to allow the jury to consider the testimony of a witness as to the attitude of the owners of Little America Motel interests, a nationally known motel enterprise in Utah and Wyoming, toward the proposed motel insurance company. Many witnesses had testified that they were told that the Little America Motel interests were so enthused about the motel insurance company that they offered to advance the entire amount of capital required. This proof may not have established the falsity of the representation conclusively, but it was competent.

■ When Jensen was on the stand, he related many conversations. Mrs. Frances Walters, wife of appellant who did not testify, was offered to testify to a conversation with Jensen after her husband had left the Washington Insurance Company. The testimony was offered to show that Jensen was trying to get Walters back and was stating that everything was all right in the company. The trial court rejected the offer on the ground that it was offered for impeachment and no foundation had been laid therefor. Appellants Walters and Cain seem to contend this was substantive testimony going to the issue of good faith and the reasons they believed they were employed by a sound firm. The statements of Jensen that the business was doing well would seem inadmissible on any theory except to prove the existence of the scheme, even if made to the wife of one who had had some connection therewith. It is stated the testimony was offered to show the intent and knowledge of Walters. Direct evidence of the state of mind of Walters and of his knowledge and intent could only have been obtained if Walters had himself given testimony. But he did not take the stand. The proffered testimony then was not connected to Walters and did not tend to prove intent or knowledge of Walters, and certainly not that of Cain. Neither did the proffered statements tend to prove affirmative withdrawal from the conspiracy. If it had any value as to Jensen, it would be only as impeachment. It was the theory of the government, however, that like statements were made by Jensen at all times in furtherance of the conspiracy.

Affirmed.