George BECK, Appellant,

v.

The UNITED STATES of America, Appellee.

David R. TUTHILL, Appellant,

v.

The UNITED STATES of America, Appellee.

Nos. 6852, 6853.

United States Court of Appeals
Tenth Circuit.

May 29, 1962.

Rehearings Denied June 21, 1962.

Russell P. Kramer, Denver, Colo., for appellant, George Beck, Hugh A. Burns, Denver, Colo., for appellant, David R. Tuthill.

Yale Huffman, Asst. U. S. Atty. (Lawrence M. Henry, U. S. Atty., on the brief), for appellee.

Before PICKETT, LEWIS and HILL, Circuit Judges.

HILL, Circuit Judge.

The two appellants, George Beck and David R. Tuthill, were indicted along with other defendants in the District of Colorado on Thirteen Counts. The first Twelve Counts charged use of the mails to defraud under 18 U.S.C.A. § 1341 and the last Count of the indictment charged a conspiracy under 18 U.S.C.A. § 371 to violate § 1341. Trial was had to a jury as to Beck, Tuthill and their co-defendant, Conklin. Beck was convicted on Counts One, Two, Three and Four and acquitted on the remaining Counts; Tuthill was convicted on Counts One through Twelve and acquitted on Count Thirteen. We are not concerned here with Conklin.

The prosecution stems from the conduct of a business venture initiated by the appellants.

In 1952, Beck became the exclusive importer to the United States and Canada for an Austrian-made hand knitting machine. For the next five years, the business did not prosper to any great extent. Early in 1957, he learned the details of a business venture in Detroit, Michigan, which combined the selling of hand knitting machines with an agreement for the purchase of garments from those buying the machines. With knowledge of the working of this business, he solicited and obtained the services of Tuthill and together they organized California Sportswear Corporation of Colorado, incorporating the same on May 24, 1957, for the purpose of carrying on a business similar to the Detroit venture. Beck became President and Tuthill Secretary-Treasurer of the Corporation. Beck and Tuthill, with salesmen employed by them, contacted women in the vicinity of Denver to sell the women the knitting machines imported by Beck at prices ranging from $300 to $350 each,

with profits to the corporation ranging from $200 to $270 on each machine. The names of the sales prospects were obtained largely from responses to advertisements placed in various area newspapers. Copies of the written sales presentation and work agreement with the purchasers of the machines and also knitting patterns were procured from the Detroit concern and used in the operation of this business.

The agreement entered into with the purchasers of the machines provided for the sale of yarn by the company to the purchasers at cost and the company agreed to purchase all garments knitted at a price twice the cost of the yarn used.

At no time during the operation of this venture did the corporation or appellants have any substantial demand or outlet for the garments bought from the purchasers of the knitting machines. The evidence does disclose some efforts on the part of appellants to create a market for the sale of these garments. Money from the sale of the machines was used to buy the garments from the machine purchasers.

In the beginning, appellants performed the sales work of the corporation, but in the fall of 1957 salesmen were hired to do this work. Instructions were given these salesmen by appellants and the written sales presentation or "sales pitch" procured from Detroit was put into use.

Late in 1957, differences arose between appellants. Beck resigned as President of the company but remained as Vice-President. His salary was discontinued as of December 31, 1957. Tuthill became President and the co-defendant, Conklin, came into the company as a stockholder and officer. Beck retained stock in the company but left Denver in January, 1958, on a trip to Europe. On this trip he attempted to make sales of the garments at several places in the United States. In Europe he spent most of his time at the factory where the knitting machines were manufactured and corresponded with Tuthill about the operation during this absence. After Beck's return to Denver in May, 1958, he resigned as Vice-President of the company and sold his stock to Conklin. The sale of all of his stock was consummated in June. The company continued to buy the knitting machines for resale from Beck and for the period from June, 1957, to June, 1959, Beck received a commission of $37 on each of at least 800 knitting machines sold by him or his privately owned company to California Sportswear of Colorado. In addition, he received substantial compensation from California Sportswear of Colorado during the time he was connected with it. Tuthill also received substantial compensation from California Sportswear of Colorado during the existence of the venture.

An example of the newspaper advertisements used to procure prospects is shown by Government's Exhibit 6–B run in the Denver Post on June 30, 1957, which read as follows:

"Help Wanted (female)

"Ladies work at home. We need 20 ladies to work at home 8–10 hrs. per week. Earn up to $35 weekly in your spare time. No experience necessary. No selling, canvassing, or telephoning. Call GE 3–0314. California Sportswear Corp."

The indictment charged the two appellants, together with others, with devising and intending to devise a scheme and artifice to defraud and to obtain money by false and fraudulent pretenses, promises and representations from a class of persons in and around Denver. As a part of the scheme, it is alleged that the California Sportswear Corporation of Colorado was incorporated May 24, 1957; that advertisements were placed in newspapers offering employment to a limited number of women in their homes on a part-time basis; that the financing of the purchase of the knitting machines was to enable the corporation to be paid for the purchase of the same; permitting the persons to be defrauded to produce items relatively easy to make

for a few months and then require such persons to manufacture only items which were difficult to make; the realization of a profit of $200 to $270 on each knitting machine sold; and deceitfully inducing the purchasers of the machines to believe that the primary business of the company was the distribution and sale of knitted garments produced by the purchasers of the machines; and that the United States mails were used in specific instances to execute such scheme.

In furtherance of the scheme, the following false representations are alleged to have induced the purchase of the knitting machines: That the corporation was doing business primarily as a wholesaler and jobber of knitted garments and that the sale of the knitting machines was incidental; that the corporation had a large and expanding market for the knitted garments and needed quantities of the garments to fill existing orders; that the women could make a profit of $10 to $50 per week from knitting with a minimum of 15 hours work per week; that four or five hours of knitting per week would be sufficient to meet the monthly payments on the machine purchased; that the corporation would purchase for three years all garments knitted; the corporation would furnish all yarn when needed; that a pair of slippers would require only thirty minutes to complete; that a stole would require an hour or less to complete; and only a limited number of women were being selected by the corporation to do the home work.

Beck urges for reversal: Insufficiency of the evidence to sustain the verdicts; inadequacy of the instructions given to the jury; and error in the admission of testimony and documents.

Tuthill attacks the sufficiency of the evidence and points to the inadequacy of the instructions to the jury.

▆ In this case there were two essential elements of proof for the government to meet in making a submissible case, (1) the existence of a scheme or artifice to defraud or for the obtaining of money by means of false pretenses, representations or promises, and (2) the use of the United States mails in furtherance of such scheme or artifice. Marvin v. United States, 10 Cir., 279 F.2d 451; Palmer v. United States, 10 Cir., 229 F.2d 861, cert. den. 350 U.S. 996, 76 S.Ct. 546, 100 L.Ed. 861; Webb v. United States, 10 Cir., 191 F.2d 512. Such proof may be made by either direct or circumstantial evidence. United States v. Ross, 92 U.S. 281, 23 L.Ed. 707; Whealton v. United States, CCA 3, 113 F.2d 710; Brady v. United States, CCA 8, 24 F.2d 397. No question is raised concerning proof of the use of the mails.

Fraud or the existence of a fraudulent scheme is seldom susceptible to proof solely by direct evidence and in nearly every such case, direct and circumstantial evidence together with the inferences to be drawn therefrom must be relied upon for proof. On the face of the business operation involved here, it may be argued that it was merely a legitimate business venture that did not work out successfully. That, however, was a question of fact, to be determined by the jury after considering all of the evidence and the inferences to be drawn therefrom.

From the voluminous trial record and the many exhibits received in evidence, it seems to us the government presented a strong and persuasive fraud case. The numerous newspaper advertisements used, many of which were admitted in evidence, are of a misleading character. They indicate a desire to offer home employment when in fact they were only lures put out to procure prospects for the sale of the knitting machines. At the very time these women were led to believe California Sportswear Corporation was a thriving knitted garment concern, actually it had no substantial market at all. The exorbitant profit made from the sale of each machine is another telling fact in the government's case. The so-called "sales pitch" or instructions to the salesmen, as shown by government exhibits 52 and 120, is false and

misleading in that it instructs the salesmen to tell the prospects that California Sportswear Corporation is the wholesale distributor throughout the United States and Canada for hand-knitted garments.

■ There is an abundance of evidence in the record to support the government's contention that appellants devised and implemented a scheme to defraud the class represented by the purchasers of the knitting machines, by authorizing a sales program which had as its purpose the persuasion of the knitting machine purchasers that they were entering into a transaction which would bring in to them extra income, when in fact, they were only buying knitting machines.

Beyond any doubt, the government presented a submissible case against both appellants and the trial court properly refused to direct a verdict of acquittal.

■ Appellants strongly urge error because of the court's refusal to give a separate instruction to the jury on their defense of "good faith." As they contend "good faith" is a complete defense to a mail fraud prosecution. Durland v. United States, 161 U.S. 306, 16 S.Ct. 508, 40 L.Ed. 709; Frank v. United States, 10 Cir., 220 F.2d 559; Hawley v. United States, 10 Cir., 133 F.2d 966; Gold v. United States, 8 Cir., 36 F.2d 16; Coleman v. United States, 5 Cir., 167 F.2d 837. We agree also with appellants in their contention that a defendant in a criminal case is entitled to adequate jury instructions on his theory of defense, provided, however, there is evidence before the jury to reasonably support such theory. Bird v. United States, 180 U.S. 356, 21 S.Ct. 403, 45 L.Ed. 570; Little v. United States, 10 Cir., 73 F.2d 861, 96 A.L.R. 889; Marson v. United States,

6 Cir., 203 F.2d 904; Levine v. United States, 104 U.S.App.D.C. 281, 261 F.2d 747. See also Coleman v. United States, supra, 167 F.2d 837. But, the sufficiency of the instructions may not be determined by the giving, or the failure to give, any one or more instructions. To make this determination, all of the instructions given must be viewed as a whole. Walters v. United States, 9 Cir., 256 F.2d 840, cert. den. 358 U.S. 833, 3 L.Ed.2d 70, 79 S.Ct. 54.

At the outset, the trial court, with care, explained to the jury each of the 13 Counts of the indictment, setting out clearly the specific fraudulent representations alleged and relied upon by the government and the necessary elements of each offense charged. The jury was advised of the defendants' position, in that they denied the making of the alleged false representations and the use of the mails to defraud and contended they acted honestly and in good faith. Thereby, the issue of honesty and good faith was squarely presented to the jury. Concerning the elements of the offenses charged in the first 12 Counts the court advised that intent to defraud the purchasers of the knitting machines was an essential element. In defining the word "knowingly" as used in the indictment the court explained "was to insure that no one would be convicted for an act done because of mistake, inadvertence or other innocent reasons." Concerning the use of the word "wilfully" in the same instrument, the court said, "An act is done wilfully if done voluntarily and purposely with a specific intent to do that which the law forbids; that is to say, with evil motive or bad purpose, either to disobey or disregard the law." The court elaborated on the term "intent to defraud" as used in the indictment.[1]

1. "You will also note that the acts charged in the indictment are alleged to have been done with intent to defraud. To act with intent to defraud means to act knowingly and with the specific intent to deceive for the purpose of either causing some financial loss to another or bringing about some financial gain to oneself.

"An essential element of all of the offenses here charged is an intent to defraud. And this intent must be established by the evidence beyond a reasonable doubt.

" 'Intent' as used here, means that the defendants must have had the purpose of willingness to defraud. A person is pre-

There is some evidence in the record to support the defense of "good faith." Beck and Tuthill testified as to their good intentions and there is some other evidence from which honesty and good faith might be inferred. But all of appellants' evidence upon this issue, when weighed against the government's evidence, presented a very weak defense.

■ Assuming, as appellants contend, there is sufficient evidence in the record to reasonably support this defense and to require the giving of jury instructions upon it, then taking all of the instructions given, as a whole, the jury was adequately and sufficiently advised concerning it, and we find no error in the instructions.

Appellant Beck urges error because of the admission of statements made by salesmen for the corporation to prospects for and purchasers of the knitting machines, all made in the absence of appellant. He relies primarily upon Beck v. United States, 8 Cir., 33 F.2d 107; Barrett v. United States, 8 Cir., 33 F.2d 115, and Reistroffer v. United States, 8 Cir., 258 F.2d 379.

Our examination of those cases convinces us that they are not applicable here. In the Beck case, there was no evidence tending to show appellant had any knowledge of the statements made. The trial had proceeded on the erroneous theory that any representation made by employees of the corporation was competent, irrespective of the defendants' knowledge, authority or ratification. The Barrett case was a companion case and the court merely reiterated the need to connect the statements of salesmen to the appellant. In the Reistroffer case, the court approved the method used by the trial court in admitting the questioned testimony and the precautionary instruction finally given to the jury concerning its consideration of such testimony.

■ It is agreed the general rule permits the admission of such statements, if they have been expressly or impliedly authorized, or have been ratified by the person against whom they are offered. Beck v. United States, supra; Barrett v. United States, supra; Gold v. United States, supra. We are cognizant of the difficulties encountered by the government in a fraud case, but safeguards for the defendant from the dangers of hearsay evidence cannot be disregarded. See Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790. The authority to render such statements admissible may be found in the circumstances of the particular case, in the scope of the plan or scheme or from other pertinent facts. A proper foundation must always be laid.

In Reistroffer v. United States, 8 Cir., 258 F.2d 379 at 387, on this evidentiary question, the court said:

"* * * Where the scheme to defraud included making sales by means of certain false representations conveyed through salesmen, proof of the same misrepresentations being made at widely different places to different persons by numerous agents in the same period, tends to prove that the scheme existed and that the particular salesman was carrying it on. As in the case of a conspiracy in operation the acts and declarations of each participant are admissible against all."

Again, in Schaefer v. United States, 8 Cir., 265 F.2d 750, cert. den. 361 U.S. 844, 80 S.Ct. 97, 4 L.Ed.2d 82, another mail fraud case, evidence of purchasers concerning conversations with salesmen not alleged to be parties to the scheme was held to be admissible as proving that the scheme was what the government claimed it to be, a scheme to defraud by false representations and promises. See also Grell v. United States, 8 Cir., 112 F.2d 861; Morris v. United States, 5 Cir., 112 F.2d 522.

sumed to intend that which he voluntarily and wilfully does and to intend all the natural, probable and usual consequences of his act and conduct."

In Whitehead v. United States, 5 Cir., 245 F. 385, 396, the court said:

" * * * More than 100 witnesses were introduced, each of whom testified that the agent had, by statements, led him to believe that he would, at the end of six (or eight or some other number of) months, be able to secure a loan of $1,000 from the company at 5 per cent. interest. The introduction of this evidence was strenuously objected to by the defendants. The objection was upon the ground that the representations were not the representations of the defendants or the company. If there had been evidence of a single transaction only, or of isolated and occasional transactions the contention might have appeared meritorious. But the accumulated evidence, aided as it was by the evidence of the subsequent conduct of the company, and by the correspondence with which the misrepresentations were always followed up, clearly indicates an established course of business, an important feature of which was systematic misrepresentation by agents."

In Ridenour v. United States, 3 Cir., 14 F.2d 888, 891, the court said:

"The proofs show that the Crager System, through its salesmen, represented to the purchasers that they were the agents of the Continental Grocery Stores of Pennsylvania, Incorporated, and they further show that the Crager System employees were at all times subject to the defendants. It therefore makes no difference whether this was a contract of sale or of agency. The defendants brought into their schemes the Crager salesmen, directed them, assumed the responsibility, and reaped the reward from their sales. It was therefore not error to admit in evidence the acts and declarations of these salesmen in executing the schemes the defendants had devised."

In Osborne v. United States, 9 Cir., 17 F.2d 246, 249, the court said:

"A large number of the purchasers of lots or sections were permitted to testify, over objection, to representations and statements made to them by the salesmen through whom the purchases were made. This testimony was objected to on the ground that it was hearsay and that the statements were not authorized by the plaintiffs in error. If this testimony related to but a single transaction, there would be merit in the objection, but, when we consider the fact that the plaintiffs in error maintained a school for the instruction of salesmen, and issued bulletins and circulars for their guidance, and that the representations made by the different salesmen were in many instances similar in tone and were to some extent at least based upon the statements and information contained in these bulletins and circulars, we think the jury were warranted in finding that the statements and representations complained of were so made pursuant to a general plan or scheme adopted and sanctioned by the plaintiffs in error."

See also United States v. Tamuel, 7 Cir., 101 F.2d 339 and Preeman v. United States, 7 Cir., 244 F. 1.

■ In this case the evidence, other than the questioned statements, was ample for the jury to find beyond a reasonable doubt: The formation or devising of scheme or artifice to defraud by appellants; the active participation in the furtherance of the scheme by appellants; their setting up of a planned sales program; and their training of and instructions to the salesmen; and the active participation in the furtherance of the scheme by the salesmen. With this foundation, the statements and representations made by the salesmen became admissible.

The testimony of the salesmen generally shows the following of a pattern con-

cerning the training and instruction of the salesmen. They basically followed the written sales presentation as shown by government's exhibits 52 and 120, were given field training by the defendants and attended sales meetings. There can be no question but what they knew that the chief objective of their efforts was to sell knitting machines and that the suggestions, as shown by the above exhibits, were for the sole purpose of making sales of such machines. The salesmen basically followed the written sales presentations furnished by appellant and some used the sales brochure (government exhibit 50). These exhibits may well be said to constitute implied authority to make the statements attributed to them by the various witnesses and complained of by Beck. We must conclude the trial court did not err in the admission of the salesmen's statements or representations.

Beck also contends the court erred in admitting testimony and documents with respect to events occurring after he had severed his connection with the company, and in refusing to give his tendered instruction concerning withdrawal. These contentions may be considered together.

These two contentions are answered by the verdict returned by the jury. Beck was convicted of four separate offenses. In point of time, the last offense was committed on May 19, 1958, and about a month prior to the consummation of the sale and transfer of all of his stock in the corporation. Therefore, any testimony or documents with respect to events occurring after June, 1958, which was admitted during the trial, was not considered by the jury in arriving at its verdict as to Beck. It cannot be concluded that any prejudice against Beck resulted from this evidence. It was clearly admissible under the conspiracy count and as against Beck's co-defendants, who maintained their connections with the company after June, 1958.

After viewing the extensive trial record as a whole and giving careful consideration to all of the contentions made here by appellants, we must conclude, that the appellants were given a fair trial and we are unable to find any prejudicial error.

Affirmed.