**Frank GOLD, Appellant,**

v.

**UNITED STATES of America,
Appellee.**

**No. 18012.**

United States Court of Appeals
Eighth Circuit.

Oct. 6, 1965.

Rehearing Denied Oct. 28, 1965.

John L. Boeger, St. Louis, Mo., Morris A. Shenker, St. Louis, Mo., for appellant.

John A. Newton, Asst. U. S. Atty., St. Louis, Mo., Richard D. FitzGibbon, Jr., U. S. Atty., St. Louis, Mo., for appellee.

Before MATTHES and GIBSON, Circuit Judges, and REGAN, District Judge.

MATTHES, Circuit Judge.

In a five-count indictment, Frank Gold, appellant, was charged with violations of the mail fraud statute, Title 18 U.S.C. § 1341. Count 2 of the indictment was dismissed prior to the trial. A jury found appellant guilty of the offenses alleged in the remaining four counts. This appeal is from the judgment imposing a four-year prison term under each count, to run concurrently.

Appellant presents two contentions: (1) that the evidence was insufficient to sustain the verdict of the jury, so the court erred in failing to grant the motion for judgment of acquittal filed at the

close of all of the evidence; and (2) that error resulted from the admission of certain documentary evidence.[1]

Appellant argues, in support of his challenge of the sufficiency of the evidence, that there is no proof that appellant "intentionally made false representations and submitted fictitious orders which induced the manufacturers to give the appellant money and samples." In order to place this contention in proper perspective, a brief résumé of the Government's theory of the case is desirable.

The indictment charged that appellant devised a scheme to defraud manufacturers of women's clothing and to obtain money and property by means of false and fraudulent pretenses, representations and promises, consisting of: representations of appellant that he would sell or promote the sale of women's clothing of Miami Sportswear Company, of Opa Locka, Florida; Modern Miss, of Chicago, Illinois; Scott Manufacturing Company, of Rusk, Texas; and Jackfin Company, of New York City; that appellant caused the companies to send him samples of their lines of women's apparel, which he disposed of without the approval of the manufacturers; that he represented that he would devote his full time and effort to the promotion and sale of the merchandise of the defrauded companies, although he knew he would make no effort to promote or sell the merchandise; that appellant forged names of owners and buyers of retail establishments to fictitious orders for merchandise and caused the dress manufacturers to suffer financial loss through their issuance of checks to appellant for services which he never intended to, and did not, perform. Each count of the indictment alleged the use of the mails for the purpose of executing a scheme to defraud.[2]

Inasmuch as the court imposed concurrent sentences of four years on each of the four counts, which is not in excess of the maximum which might have been imposed under any count, there can be no legal prejudice if the conviction on any count is sustained by competent evidence and is otherwise invulnerable to attack. Gajewski v. United States, 321 F.2d 261, 264, and cases there cited (8 Cir. 1963). In light of this principle, our summary of the pertinent evidence will be confined largely to the first count, which is focused upon appellant's dealings with Miami Sportswear and use of the mails on July 19, 1961. We hasten to add, however, that there is an abundance of evidence to support the conviction on the three remaining counts.

After correspondence, appellant was employed by Miami Sportswear as a salesman in the territory of Missouri, Kentucky, and Tennessee (with the exception of Memphis). As set forth in a letter, Miami agreed to advance appellant a 7% commission on his booked sales accepted for credit on the 15th of each month. A later letter from Miami to appellant, dated August 31, 1961, stated: "In reply to your letter of August 31st, we will agree to advance you against commissions $300.00 on September 18th, $300.00 on October 1st, and $300.00 on October 15th, with the understanding that during this period you will be travelling the territory exclusively with our line." Accordingly, appellant received from Miami checks for $300 on September 15, 1961, September 30, 1961, October 14, 1961, and October 31, 1961. Miami received its first order, purportedly placed by a store buyer in appellant's sales territory, on September 28, 1961. Pursuant to its reception of this, and 33 additional orders, between September 28 and November 3, 1961, supposedly from store owners and buyers in appellant's sales territory, Miami pur-

1. Appellant's brief fails to contain a concise statement of each point to be argued as required by our Rule 11(b). We have overlooked the omission and consider the merits of the issues.

2. Appellant does not even suggest that the mails were not used. Count 1 is based upon use of the mails on July 19, 1961; Count 3 upon use of the mails on November 23, 1961; Count 4 on February 24, 1962; and Count 5 on December 21, 1962.

chased from $10,000 to $15,000 of extra goods to fill the orders. On November 16, 1961, the first order was cancelled and all others were subsequently cancelled after Miami discovered that the orders did not originate from the persons whose signatures appeared on the order blanks and, moreover, that none of the stores had placed orders with Miami. Miami thereupon terminated appellant's employment and has not been reimbursed for any of the $300 checks appellant received.

After the termination of his employment with Miami, appellant entered into three additional, and consecutive, transactions with Modern Miss, Jackfin, and Scott manufacturing companies which followed the basic pattern established in his Miami Sportswear dealings.

Count 3 is based upon use of the mails on November 23, 1961, and is centered on appellant's dealings with Modern Miss, resulting from its employment of him on or about November 20, 1961. Modern Miss sent samples worth approximately $733 to appellant. A drawing account, against appellant's commissions, of $125 per week was agreed upon. Appellant received three checks for $125 each before the orders sent in by appellant were cancelled. Appellant neither returned the samples nor any of the money which he received by checks.

Count 4 involves appellant's transactions with Jackfin Company after it employed him in December, 1961. Specifically, this count is based upon use of the mails on February 24, 1962. Jackfin shipped appellant a line of samples worth $2,000. Appellant was later sent a second set of samples, having a value of $2,000, after he informed Jackfin that the first group of samples had been stolen, but were insured, and Jackfin would be reimbursed for them. Five checks for $100 each, as a draw against commissions, were sent to appellant over a several week period. Mr. Finkelstein, of Jackfin, testified that the checks had been advanced to appellant because of the orders Jackfin received from appellant. Subsequently, all but two of the orders sent in by appellant were cancelled since the orders had neither been placed, nor signed, by the buyers. Two of the orders were genuine. Jackfin was never reimbursed for the checks issued appellant, the "insured" samples which had been stolen, nor the bulk of the second group of samples.

Count 5 is predicated upon use of the mails on December 21, 1962. This count bears upon appellant's transactions with Scott Manufacturing Company, which employed him in December, 1962. Scott sent appellant samples worth $430, and also sent him a check for $265.93. As had occurred with the three previous companies, the orders sent in by appellant were cancelled because the buyers, whose signatures appeared on the orders, had neither placed, nor signed, the orders. Scott notified appellant of the cancellations and demanded its $265.93 back. Scott has neither received the samples nor been reimbursed for the $265.93 check.

In summary, the scheme appellant followed with respect to each of the four manufacturing companies consisted of: (1) misrepresentations to each company that appellant would sell or promote their goods; (2) which caused each company, acting in reliance on the misrepresentations, to give appellant samples and to advance him checks drawn against his prospective commissions; (3) after which appellant sent in a total of 76 fictitious orders, purportedly signed, and placed, by buyers; (4) all of which orders, with the exception of two, had to be cancelled by the companies when they discovered that the goods had not been ordered by the buyers, nor had the buyers signed the orders.

As a result of this scheme the four manufacturers lost approximately $5,000 worth of samples, and $2,340.93 in checks.

Appellant did not deny any of the transactions. His defense was that these orders were "distribution orders" which he used as a promotional technique, hoping that, if the buyers received the goods he had ordered, they would keep and

sell them. He also argued that, according to the trade custom, the checks advanced to him by the manufacturers were not refundable to the companies in the event that he was unable to make sales. However, his own witnesses on the question of a custom in the trade were confusing. They testified both that there was such a custom and that it varied with the individual manufacturer whether the money advanced was to be returned if no sales were made.

■ Appellant's argument that there is a complete absence of any evidence to establish that he made any misrepresentations which caused the companies to employ him and to give him money and samples is without merit. The essential elements of an offense under the mail fraud statute are (1) a scheme conceived by appellant for the purpose of defrauding the companies by means of false pretenses, representations or promises, and (2) use of the United States mails in furtherance of that scheme. Dranow v. United States, 307 F.2d 545, 557 (8 Cir. 1962); Beck v. United States, 305 F.2d 595, 598 (10 Cir. 1962). Although there may be no direct evidence that appellant made false representations which induced the manufacturers to advance money or property to appellant, it can hardly be denied that the circumstances not only support, but impel, the finding that the representations which induced appellant's employment, and resulted in appellant's reception of checks and samples from each of the manufacturers, were false and fraudulent and were a part of appellant's overall scheme to defraud. Citations of authority are not necessary to support the well-established principle that proof of all elements of the offense may be made by either direct or circumstantial evidence, but see Northcraft v. United States, 271 F.2d 184 (8 Cir. 1959); Beck v. United States, supra, 305 F.2d at 598.

Appellant's second contention is that the trial court erred when it admitted, over appellant's objection, Government exhibits, consisting of 67 orders to the four manufacturers, all but two of which had been cancelled.

■ Appellant's first objection is that the orders received by the companies were subsequent to the checks sent appellant and, therefore, were not inducements to pay appellant. The record does not support appellant's view of the evidence. Some of the checks, in particular four from Jackfin, were sent out after orders began to be received from appellant. In fact, there was testimony by Mr. Finkelstein, of Jackfin, that checks were advanced to appellant because of the orders appellant sent in.

■ Appellant's second objection is that admission of these orders into evidence was prejudicial because they were the only evidence of misrepresentation and they were received by the companies after the checks were sent. We are unable to accept appellant's assessment of the evidence in this respect. In view of appellant's scheme, the jury was warranted in finding that his acceptances of employment amounted to misrepresentations. Also, since some of the checks were sent him after orders were received, the orders constituted relevant and proper evidence of further misrepresentations.

We are satisfied that appellant received a fair trial. The evidence to sustain the convictions is strong and convincing, and requires affirmance of the judgment.