Stanley FRIEDMAN, Appellant,

v.

UNITED STATES of America,
Appellee.

Francis LOWERY, Jr., a/k/a Fred Lowry,
Appellant,

v.

UNITED STATES of America,
Appellee.

Ralph O'GRADY, Appellant,

v.

UNITED STATES of America,
Appellee.

Wayne A. SCHMIDT, Appellant,

v.

UNITED STATES of America,
Appellee.

Robert SCHAFER, Appellant,

v.

UNITED STATES of America,
Appellee.

Arvin MUESCHKE (a/k/a Arvin
Mueske), Appellant,

v.

UNITED STATES of America,
Appellee.

Kay PETERSON, Appellant,

v.

UNITED STATES of America,
Appellee.

Nos. 17673–17676, 17681, 17689, 17690.

United States Court of Appeals
Eighth Circuit.

June 30, 1965.

Morton N. Wekstein, Yonkers, N. Y., made argument for appellant, Stanley Friedman and filed typewritten brief.

Maclay R. Hyde, Minneapolis, Minn., made argument for appellant, Francis M. Lowery, Jr., a/k/a Fred Lowry, and others, and filed typewritten brief.

Franklin Petri, Jr., Minneapolis, Minn., made argument for appellant, Ralph O'Grady, and filed typewritten brief.

Frank E. Proctor, Minneapolis, Minn., made argument for appellant, Wayne A. Schmidt, and filed typewritten brief.

John F. Eisberg, Minneapolis, Minn., made argument for Robert Schafer, and filed typewritten brief.

Donald K. Smith, Minneapolis, Minn., made argument for Arvin Mueschke and Kay Peterson, and filed typewritten brief.

Patrick J. Foley, Asst. U. S. Atty., Minneapolis, Minn., made argument for appellee and filed printed brief, with Miles W. Lord, U. S. Atty., Minneapolis, Minn.

Before VOGEL and BLACKMUN, Circuit Judges, and REGISTER, District Judge.

VOGEL, Circuit Judge.

By grand jury indictment, eleven persons were charged in twelve counts with having violated 18 U.S.C.A. § 2[1] and 18 U.S.C.A. § 1341 proscribing mail fraud.[2] Defendants named were Gil Anthony, Evan Eppert, Stanley Friedman, Henry Klug, Fred Lowery, Arvin Mueschke, Ralph O'Grady, Kay Peterson, Robert Schafer, Wayne Schmidt and Jerome Tremont. During a seven weeks' trial in the United States District Court for the District of Minnesota eight of the defendants were found guilty by jury verdict of various counts of mail fraud; one defendant, Gil Anthony, was acquitted by the jury; the trial judge directed the acquittal of Jerome Tremont; and the government moved for and obtained a dismissal as to Henry Klug. Of the eight convicted, Evan Eppert did not appeal. Accordingly, this proceeding is concerned with the appeals of Kay Peterson, Stanley Friedman, Fred Lowery (or Lowry), Arvin Mueschke, Ralph O'Grady, Robert Schafer and Wayne Schmidt.

## THE INDICTMENT

The indictment charges that during the period from on or about January 1, 1957, and continuously thereafter to on or about May 20, 1962, the defendants " * * * devised and intended to devise a scheme and artifice to defraud, and to obtain money and property by means of false and fraudulent promises, pretenses, and representations from students and prospective students of the dance studios operated by and for Defendants, which said students and prospective students include the following: [naming them]". Each count of the indictment charged separate use of the mails in furtherance of the overall scheme to defraud.

It was charged that in furtherance of the scheme the appellants operated two studios, one in Minneapolis and one in St. Paul, Minnesota, under the names "National Dance Studios" and "Dale Dance Studios". The indictment charged that the scheme to defraud included sales meetings at which the appellants talked to and advised dance instructors on the use of coercion, duress and undue influence, and how their forces could be exerted on students; on the means of selling contracts of great expense to students; and on the means of receiving large amounts of money without having the intention to abide by the terms of the contracts for dancing lessons; means of inducing students to visit the studios included telephone messages and mailed invitations. It was charged that after a student had visited a studio and agreed to a short contract, new inducements were made to get the student to execute other and additional contracts for large sums of money without the intention to complete and fulfill such contracts. Fake contests were represented as being bona

---

1. "§ 2. *Principals*

    "(a) Whoever commits an offense against the United States, or aids, abets, counsels, commands, induces, or procures its commission, is punishable as a principal.

    "(b) Whoever willfully causes an act to be done, which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

2. "§ 1341. *Frauds and swindles*

    "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Post Office Department, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both."

fide and essential for a continuation of dancing lessons. The fact was, however, that their function was to create a feeling of fear and anxiety on the part of the student who, upon hearing that she had passed the test, was relieved and comforted and in the proper frame of mind to execute another contract for an even larger sum of money. The approval test was one means of exerting coercion, duress and undue influence. It was charged that the appellants utilized a number of false promises to induce students to purchase contracts. These false promises included, among others, the promises that the student could learn dancing and increase her skill in dancing; the student could acquire a specific degree of agility in a specified number of lessons; the student's progress would be objectively approved by a board; the student would receive one or more free trips to such places as Chicago, New York and San Francisco or Honolulu, Hawaii, Kingston, Jamaica, and Las Vegas, Nevada, for executing contracts; a student could complete long-term five-year, ten-year, life-time or other courses; the student had acquired the requisite ability in dancing to join an exclusive club; that by executing and completing a contract the student would become an exhibition dancer for television programs; and that the student would receive private lessons for the contracts.

It was claimed that the appellants' fraudulent intent was demonstrated by (a) the approval test; (b) the sales devices used in connection with the test and the sales pitches; (c) the repeated attempt to escalate the student's contractual obligations; and (d) the phasing out of students from private lessons to group or club lessons, contrary to promises made when obtaining contracts.

## VERDICTS AND SENTENCES

Jury verdicts and sentences imposed on those convicted were as follows:

Kay Peterson was acquitted on counts 1 and 8; convicted on counts 2, 3, 4, 5, 6, 7, 10, 11 and 12. She was sentenced to pay a fine of $1,000; a term of 18 months' imprisonment was suspended and she was placed on probation for three years.

Stanley Friedman was acquitted on counts 1 and 8, and convicted on counts, 2, 4, 5, 6, 7, 10, 11 and 12. He was sentenced to two years' imprisonment.

Fred Lowery was acquitted on counts 1 and 8, and convicted on counts 2, 4, 5, 6, 7 and 10. He was ordered to serve three years on probation.

Arvin Mueschke was acquitted on counts 1 and 8, and convicted on counts 2, 3, 4, 5, 6, 7, 10, 11 and 12. He received a sentence of one year and one day's imprisonment which was suspended and he was placed on probation for a period of two years.

Ralph O'Grady was acquitted on count 1, and convicted on counts 4 and 5. He received a sentence of 18 months' imprisonment, to serve five months and then to be placed on probation for a period of three years.

Robert Schafer was acquitted on counts 1 and 8, and convicted on counts 4, 5, 6, 7 and 10. He received a sentence of 18 months' imprisonment suspended, and placed on probation for three years.

Wayne Schmidt was acquitted on counts 1 and 8, and convicted on counts 2, 4, 5, 6, 7 and 10. He received a sentence of 18 months' imprisonment suspended and was placed on probation for a period of three years.

Evan Eppert, who did not appeal, was acquitted on count 8 and convicted on counts 2, 4, 5, 6, 7, 10 and 11. He was sentenced to 18 months' imprisonment which was suspended and he was placed on probation for a period of three years.

Gil Anthony was acquitted on all counts submitted to the jury as to him; namely, counts 2, 6, 7, 8 and 10.

While we are presented herein with separate appeals from the seven appellants, they were, nevertheless, prosecuted together under one indictment, tried at the same time before one jury, and they will be treated here in this single opinion, separate reference being made to the

individual appellants as that may become feasible or necessary.

## MOTION TO DISMISS OR FOR SUPPRESSION OF EVIDENCE AND RETURN OF SEIZED PROPERTY.

On November 14, 1963, before trial, Jerome Tremont, Stanley Friedman and Kay Peterson moved to dismiss the indictment or in the alternative to suppress certain evidence and order its return to the movants upon the ground that the evidentiary material was unlawfully seized without a warrant and in contravention of the rights guaranteed by the Fourth Amendment to the Constitution of the United States.

The records of which suppression was sought (under 18 U.S.C.A. Rule 41(e) ) had been located on the fourth floor of premises described as 55 South 8th Street, Minneapolis, Minnesota, which premises were under lease (by assignment) to National Dance Studios, Inc., of which Stanley Friedman and Kay Peterson were the sole stockholders. It was contended that National Dance Studios, Inc., was the owner of certain of the records so seized and the bailee of the remaining records seized, which were owned by Dance Studios of St. Paul, Inc. (of which Stanley Friedman was the principal stockholder) and Dance Studios of Minneapolis, Inc. (of which defendant Jerome Tremont was the principal stockholder and officer). The material seized allegedly consisted of records made up from and during the operation of the dance studios, agreements between the parties, letters, account books cash receipt books, phonograph records and tape recordings regarding sales procedures, newspaper advertisements, photo albums, stationery, etc., all belonging to or connected with the three corporations named supra and used in connection with the operation of dance studios in Minneapolis and St. Paul.

The District Court, with meticulous care, conducted a two-day hearing on the motion to suppress, at the conclusion of which it found that the premises and the records seized had been abandoned. The motion was denied and this ruling has been attacked here as erroneous and the search and seizure by the government as violative of the Fourth and Fifth Amendments to the Constitution of the United States.

Appellants other than the movants devoted substantial portions of some of their briefs to the question of standing to raise the question of unlawful search and seizure of the records. The government's concession, made at the beginning of the hearing on the motion to suppress, may now estop it from claiming that *any* of the appellants lacked standing to object.[3] We think the estoppel extended

3. The government's concessions appear at different places in the transcript as follows:

"Your Honor, *we are not going to object on the ground of the standing of the moving parties* to file a motion and to prevail if the issues warrant. We are not objecting to the standing." (Emphasis supplied.)

Government counsel also said:

" * * * *we don't object to standing as to whether the co-defendant can object to exhibits taken from somebody else or that employees of a corporation can object to corporate property taken*, we don't concede that the lease was in effect at the time, and I think that until they establish that the lease was in effect at the time of the seizure, that they do not have a sufficient amount of evidence to change the burden of proof" (Emphasis supplied.)

The government's brief states:

" * * * While there is an equivocation or ambiguity in the two concessions quoted here, the Court will probably hold that the Government—because of the concessions—is estopped from attacking the standing of Friedman, Mueske and Miss Peterson. [The record indicates that Tremont, Friedman and Peterson were the movants.] *We stipulated as to 'employees of a corporation' and the 'moving parties'.* While we might argue that appellants should have removed the ambiguity, we believe that, without agreeing as to the merits of the factual and legal issues, we are estopped as to Friedman, Mueske and Miss Peterson." (Emphasis supplied.)

also to the other defendants inasmuch as they were "employees of a corporation"; namely, one or more of the three corporations referred to herein. Be that as it may, we find it unnecessary to further consider the question of standing or the subsidiary question of whether the officers and employees of the corporation might claim the privileges of the Fourth and Fifth Amendments when the records involved are those of a corporation.[4] Our examination of the 349-page transcript of the hearing on the motion to dismiss the indictment or to suppress satisfies us that the conclusion of the trial court that the records had been *abandoned* is supported by substantial testimony and may not be reversed by this court and that such records had been seized by the Postal Inspectors on July 24, 1962, and not at any prior date.

The record indicates that the premises known as the fourth floor of Nos. 804 and 806 Nicollet Avenue, Minneapolis, with entrance at 55 South 8th Street, were leased on December 20, 1960, for a five-year term beginning January 1, 1961, to the Dance Studios of St. Paul, Inc., a Minnesota corporation owned by one or more of the defendants. Rental from January 1, 1961, through December 31, 1962, was at the rate of $300 per month. The balance of the term carried a rental of $325 per month. On September 7, 1961, the lease was assigned to the National Dance Studios, Inc. Apparently dance studios had been operated at such premises and also at rented studios in St. Paul since at least January 1, 1957. Ultimately, with a falling off of business, payment of rentals became difficult. At the end of November 1961 the lessee was $1700 in arrears. In December 1961, Charles Cox, attorney for the National Dance Studios and Kay Peterson, settled this indebtedness with Thorpe Brothers, agents for the owners, for $500, to be paid during 1962 over several months' period. Nevertheless, rentals continued

to fall behind. Sometime before May 31, 1962, Attorney Cox called Andrus Thorpe of Thorpe Brothers, Inc., and " * * * indicated that the tenant was no longer going to occupy the premises * * *." Cox " * * * indicated that Miss Peterson's efforts to continue the studio's operations had gotten to the point where it was not economically possible to continue, and Miss Peterson or the National Dance Studios, Inc., under the lease could not continue occupying the premises, could not continue paying rent. He indicated that we could sue if we so desired, but that there probably wouldn't be any benefits to be gained by doing so because there wasn't any money there to be received from a suit." Cox stated to Thorpe, "We have to walk away from the lease, can't continue any longer." He said, " * * * they were going to terminate occupancy. They could have taken it out that day or waited until the end of the month. It was during the month of May, and we indicated if they were out by the end of May, we wouldn't press them any or anything." Cox assured Thorpe that the tenants would be out as soon as possible.

Kay Peterson testified that she closed the studio May 18 or 19, 1962. At that time she took the active records with her and left the inactive records as being of "no immediate use to them". On the following Saturday she went back to the studio with her accountant and removed some of the furniture and some of the records which were of value to the accountant. Mr. Cox, her attorney, advised Miss Peterson "to let Mr. Bachman take whatever furniture he wanted on payment of this bill." At that time all the furniture was removed. Records were removed from the files and left on the studio floor. Miss Peterson stated that at that time "I told Mr. Thorpe that I was no longer going to continue doing business there because there was no business; business was poor and financially

4. Wilson v. United States, 1911, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771; United States v. Guterma, 2 Cir., 1959, 272 F.2d 344; United States v. Fago, 2 Cir., 1963, 319 F.2d 791; Christianson v. United States, 8 Cir., 1955, 226 F.2d 646, 653; Underhill's Criminal Evidence, 5th Ed., § 359.

I was unable to keep the doors open, and that I would remove the things as best I could." Thereafter Miss Peterson went back to the premises periodically to pick up the mail. On June 10, 1962, suit was commenced by a former student. Miss Peterson called Arvin Mueschke on June 11th or 12th, asking him to get the records of that student for use in defense of the suit. He reported to her that the "place had been cleaned out", that there were no records excepting scrap on the floor. Thereafter Miss Peterson stopped going to the studio.

On June 27, 1962, Miss Peterson signed a change of postal address card so that mail formerly addressed to her or the studio at the leased premises would be sent to a post office box. She never returned to the studio after receiving the call from Mueschke to the effect that the place had been cleaned out and that there were no records excepting scrap on the floor. She testified:

"Q. You mentioned that you had left certain records on the premises when you left on May 18th?

"A. Yes.

"Q. Is that correct?

"A. Yes.

"Q. Was it your intention to abandon those records? * * *

"The Witness: The day I left I had no intentions at all, except that I was closing the studio.

"The Court: I didn't hear.

"The Witness: I said, the day I left I had no intention or no plans of any kind. I was very upset at closing the place. *My only thought was that I was closing the door for the last time.*" (Emphasis supplied.)

Mueschke testified as to Miss Peterson's telling him about the middle or latter part of May that the studio was closed, that the funds were exhausted, that he should take out of the studio any of his personal belongings. He did this the next day. It was about three weeks thereafter in the early part of June that

Miss Peterson called him and asked him to get the files on a student who had sued.

Thorpe Brothers considered the studio premises after May 31, 1962, as "abandoned" or "unoccupied", and their report for June 1, 1962, listed the studio premises for rental. "For rent" signs were put up in the lobby of the building and in some windows facing Nicollet Avenue, although the time of putting up the signs was not clear. Early in June 1962 Thorpe visited the premises and observed that the file cabinets and desks had been removed and that some records remained. During June and July Thorpe planned to rent out the premises and as to the remaining records, he testified, "I assumed maybe they were just old receipts or file cards and they went out of business and that no one wanted them." He assumed "everything there was left for us to clean up." Thorpe notified Kay Peterson by letter addressed to her last known address that he (Thorpe Brothers) was repossessing the premises and the personalty for abandonment and nonpayment of rent. The letter was written at the request of Postal Inspector Edwin Stahlberg. It was dated July 24, 1962, was addressed to National Dance Studios, 55 South 8th Street, Minneapolis, Minnesota, and read as follows:

"Gentlemen:

"This is to advise that because you have abandoned your leased premises and ceased paying rent we have taken possession of whatever personal· belongings and records which were left on the premises."

Inspector Stahlberg had been assigned to this case on July 23, 1962. He communicated with Mr. Thorpe, who said, " * * * that they had moved and that there wasn't anything of value left. I asked him, 'Normally, what would you do with this?' He said, 'Well, we are about ready to clean it up and dispose of it as waste.' After seeing the records, I asked him if it would be all right if we took them. He said, 'Why, you can have them. We aren't going to use them.

They are of no value to us.'" On July 24th Stahlberg entered the studio premises, where he found the records "strewn all over the floor and part of it was in a big metal container like a trash barrel." The records were seized at that time. Telephone company records indicated that telephone service to the studio was abandoned on or before June 18, 1962.

Briefly summarized, we find the following:

1. The dance studio closed about the middle of May 1962.

2. Back rent covering periods prior to the closing of the studio remained unpaid.

3. The studio's attorney advised Thorpe Brothers, agents for the landlord, sometime in May 1962 that they could no longer continue in business and would get out as soon as possible.

4. Thorpe Brothers, Inc., was informed by the attorney for the studios that they could sue if they wanted to but that there wasn't any money to be obtained therefrom.

5. Sometime during May 1962 Miss Peterson, with the help of other defendants, took from the studio all the active files and the furniture.

6. Inactive files were taken from the filing cabinets and left on the floor of the studio and in a metal trash barrel.

7. Kay Peterson, who had been managing the studio business, testified that when she left the studio on May 18th "My only thought was that I was closing the door for the last time."

8. The premises appeared on Thorpe Brothers' list of properties for rent as of June 1, 1962.

9. For rent signs were placed in the windows.

10. Defendants, through their attorney, had notified the landlord's agent that they were out of business and could not even pay the past due rent.

11. On July 24, 1962, the Postal Inspector, after first obtaining permission from Thorpe Brothers, entered and seized.

12. Much of the seized property was used in the trial and to obtain the names of "victims" who subsequently appeared and testified for the government.

Additional testimony, which we find it unnecessary to recite here, lends support to the trial court's conclusion that the property seized had been abandoned by its owners.

▮▮▮ Abandonment is an ultimate fact or conclusion based generally upon a combination of act and intent. How did the person who was supposed to have abandoned the property act, that is, what did he do, and, second, what was his intention? These call for factual determinations. But as was said by the late Judge Gardner, speaking for this court in Linscomb v. Goodyear Tire & Rubber Co., 8 Cir., 1952, 199 F.2d 431, 435:

"* * * An abandonment must be made to appear affirmatively by the party relying on it, and an intention to abandon will not ordinarily be presumed, and this is particularly true if the conduct of the owner can be explained consistently with a continued claim. Proof of abandonment must be made by the one asserting it by clear, unequivocal and decisive evidence."

See, also, United States v. Minker, 3 Cir., 1962, 312 F.2d 632, 634–635:

"Abandonment, of course, is largely a question of intent. United States v. Wheeler, 161 F.Supp. 193, 198 (W.D.Ark., 1958). Intent, in turn, is a question of fact. Schauffler for and on Behalf of N. L. R. B. v. United Ass'n of Journeymen & Apprentices of the Plumbing Industry, Local 420, 230 F.2d 572, 576 (C.A. 3), cert. denied, 352 U.S. 825, 77 S.Ct. 37, 1 L.Ed.2d 48 (1956). The district court, in denying the motion to suppress, filed a memorandum opinion in which it fully set forth the facts upon which it based its holding that there had been an abandonment. We need not here

again recite them but need only say that they amply support its conclusion. The appellant cites United States v. Merritt, 293 F.2d 742 (C.A. 3, 1961), and Work v. United States, 100 U.S.App.D.C. 237, 243 F.2d 660 (1957). Those cases are inapposite. In both of them, the acts which revealed the evidence were the direct consequence of an illegal entry. This was true also in Polk v. United States, 291 F.2d 230 (C.A. 9, 1961), although the decision there turned upon whether the area was within the protection of the Fourth Amendment."

Roberts v. United States, 8 Cir., 1964, 332 F.2d 892, 898. Appellants' motion herein, made under the provisions of Rule 41(e), Federal Rules of Criminal Procedure, 18 U.S.C.A., called for a hearing prior to trial at which the trial judge, after receiving evidence on the issue of fact, was to draw the necessary conclusion. We think Judge Nordbye's statement in making his ruling to be well supported by substantial evidence brought out in the hearing on appellants' motion. He said:

"I would find on this evidence that all Kay Peterson was interested in up until at least June 1st, was the removal of the furniture and such things as had value, and that at least some of these were given to Mr. Bachman, the accountant, who had a claim against the studio. She removed all of her personal belongings and all the current records, and I would conclude from the evidence that she had no interest whatsoever in the remaining records; that insofar as the corporation was concerned, it was through, it was defunct, it had no money whatsoever, even to pay taxes, and that any records there she considered as junk, and I would assume from the evidence, having remained there for a period of over two months, that she was satisfied to let the Thorpe Bros. have the burden of removing these

records or destroying them or doing whatever they wanted to do.

"I think that the evidence fully justifies a finding not only of acts that strongly suggest abandonment, but intention as well, and that the fulfillment of both of these requirements are [sic] sustained by the evidence."

The Supreme Court dealt with a comparable problem in Abel v. United States, 1960, 362 U.S. 217, 241, 80 S.Ct. 683, 4 L.Ed.2d 668. There an agent of the FBI, in searching petitioner's hotel room immediately after the petitioner had paid his bill and vacated the room, took articles in the room's wastepaper basket where petitioner had put them when packing his belongings and preparing to leave. The Supreme Court stated, at page 241 of 362 U.S., 80 S.Ct. at page 698:

"* * * No pretense is made that this search by the F. B. I. was for any purpose other than to gather evidence of crime, that is, evidence of petitioner's espionage. As such, however, it was entirely lawful, although undertaken without a warrant. This is so for the reason that at the time of the search petitioner had vacated the room. The hotel then had the exclusive right to its possession, and the hotel management freely gave its consent that the search be made. Nor was it unlawful to seize the entire contents of the wastepaper basket, even though some of its contents had no connection with crime. So far as the record shows, petitioner had abandoned these articles. He had thrown them away. So far as he was concerned, they were *bona vacantia*. There can be nothing unlawful in the Government's appropriation of such abandoned property. See Hester v. United States, 265 U.S. 57, 58, [44 S.Ct. 445, 446, 68 L.Ed. 898]. The two items which were eventually introduced in evidence were assertedly means for the commission of espionage and were themselves seiz-

able as such. These two items having been lawfully seized by the Government in connection with an investigation of crime, we encounter no basis for discussing further their admissibility as evidence."

This court, in Feguer v. United States, 8 Cir., 1962, 302 F.2d 214, certiorari denied, 371 U.S. 872, 83 S.Ct. 123, 9 L. Ed.2d 110, had before it the same question. There petitioner sought to suppress as evidence articles seized as a result of a search of his room on which rent had been paid, but which petitioner had left with no intention of returning. Judge Blackmun, speaking for this court, said, beginning at page 249:

"These cases, however, are concerned with occupied and not vacated premises. In the case before us the evidence is uncontroverted that the items were seized only after the defendant had returned to the room, had gathered his desired belongings and had departed never to return. This departure effected a discard and abandonment of those items. The present situation, it seems to us, is governed by Abel v. United States, 1960, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668. (See supra.)

\* \* \* \* \* \*

" \* \* \* See also Hester v. United States, 1924, 265 U.S. 57, 58, 44 S.Ct. 445, 68 L.Ed. 898, and Newingham v. United States, 3 Cir., 1925, 4 F.2d 490, 493, cert. den. 268 U.S. 703, 45 S.Ct. 638, 69 L.Ed. 1166. *Abandonment is not to be foreclosed here until the paid rent period ran out any more than, in the Abel case, it was not foreclosed until the checkout hour had arrived.* It follows that the search and seizure here, although without a warrant, were not illegal and that the evidence in question is not inadmissible on the constitutional grounds asserted." (Emphasis supplied.)

■ We find here that proof of abandonment was by "clear, unequivocal and decisive evidence". There is nothing in the record which indicates that the operators of the studio or the stockholders of the corporation holding the lease thereon intended a continued claim on the premises or its contents. The record fully supports Judge Nordbye's conclusion that the premises and the old records had been abandoned. There was no error in the denial of the motion to dismiss or suppress.

## SUFFICIENCY OF THE EVIDENCE

■■ Some of the appellants attack the sufficiency of the evidence herein. In considering that question, we of course view the testimony in the light most favorable toward sustaining the jury verdicts and resolve all reasonable inferences in favor of the government. Koolish v. United States, 8 Cir., 1965, 340 F.2d 513, 519, certiorari denied, 85 S.Ct. 1805; Smith v. United States, 8 Cir., 1964, 331 F.2d 265, certiorari denied, 379 U.S. 824, 85 S.Ct. 49, 13 L.Ed.2d 34; Slocum v. United States, 8 Cir., 1963, 325 F.2d 465. This case was tried over a period of approximately seven weeks. Transcript of the testimony and the court's charge to the jury is well in excess of 7,000 pages. We have no intention, nor do we believe it necessary, to relate in full what the government established by this testimony. It is clear from that transcript, however, that the jury could and undoubtedly did find as follows:

In about 1957, the beginning of the indictment period, the appellant Stanley Friedman came to the Twin Cities of Minneapolis and St. Paul to take charge of the studios which were then operated in each of the two cities. His capacity was that of manager. Apparently the studios were known at that time as the Dale Studios and were owned by a corporation, the stock of which was in the name of Jerome Tremont of Denver, Colorado, who was a brother of appellant Stanley Friedman. In the early part of 1959 the appellant Kay Peterson became manager of the St. Paul studio. Appellants other than Kay Peterson and Stanley Friedman were dance instructors and salesmen of studio dance contracts.

A scheme was devised for the operation of the studios in Minneapolis and St. Paul in which all of the appellants entered from time to time, knowingly and intentionally joining in the scheme to defraud persons who were to be enrolled as dance students in the studios. Mainly the "victims" of the scheme were single men and single women who would be solicited by telephone or by letters to visit the studios under the guise that they were the recipients of free dancing lessons, when in truth and in fact such was merely a come-on scheme and they were talked into signing high-priced contracts for dancing lessons and club memberships. The sales technique consisted of various lectures, recitals, photographic reproductions and written instructions devised by the operators and intended to disguise the real purpose of the so-called "free lessons". Victims or students would be told that he or she was to take a test before an approval board in order to test the improvements resulting from the dancing lessons given. This was a mere subterfuge in order to get the student to believe that he or she was to be subjected to a bona fide test of dancing ability, when in fact this was mere pretense and sham to make the prospective student believe that he or she had marked dancing ability and personality to the extent that he or she should be considered by the studio as one with the required ability and personality to proceed into an extension class, usually the Hobby Club. Hobby Club contracts generally provided for 36 months of club instructions or lessons in dancing. From the Hobby Club the victims were escalated to the Country Club, which contract called for $4,990 or at some lesser discounted price.

Appellants would and did sell a so-called Diamond Trophy Contract to certain students which allegedly were agreements on the part of the studio to make exhibition dancers out of the students or TV dancing performers, whereas the appellants were well aware that such students never could become exhibition dancers or TV performers by reason of age, mentality or lack of dancing ability.

Contracts for dancing lessons for 10, 20, 25 years and life were sometimes sold with prices ranging up to and from $4,990 to approximately $6,000.

At some time during the indictment period Stanley Friedman made arrangements to purchase his brother's stock in the corporation known as the Dance Studios of St. Paul. Later a new corporation known as the National Dance Studios was formed, the stock of which was owned equally between Stanley Friedman and Kay Peterson. This occurred in approximately January 1961.

The government contended and the evidence indicated that the Hobby Club contracts called for a price of $1800 and the Country Club contract a price of $4,990. But, in order to close sales, the appellants allowed discounts and so-called scholarship credits, so that in actuality no uniform charges for the contracts were maintained, it being the policy of the appellants to extract as much money as could be obtained from a victim, regardless of the amount of dancing instruction or other benefits which were to be accorded. Each of the appellants was employed at either the St. Paul or Minneapolis studio sometime during the indictment period. Each was paid some $2.00 to $2.50 an hour for dancing instructions plus commissions on all contracts sold by them to victims. In furtherance of the over-all scheme, the United States mails were used in various ways, such as the transmittal of invitations, free dance certificates, reactivating letters, programs, activities schedules and letters of various kinds sent from the studios and its employees with the knowledge of all of the participants in the scheme. That the use of the mails was extensive is indicated by the fact that from 1958 to late 1961 some $5,000 in postage was registered on postal meters from the Minneapolis studio.

Without a further fact recital, we think it perfectly clear that a charge of insufficiency of the evidence cannot be sustained.

Appellant Lowery contends that there was a fatal variance between the indictment and the proof, his position being that while the indictment charged and the court instructed as to a single general overall scheme involving management and personnel from both the Minneapolis and St. Paul studios, the evidence was at variance thereto and at best indicated two disconnected and different schemes. We think it well established that there was one overall scheme to defraud and that this overall scheme encompassed both the Minneapolis and St. Paul studios. It was not essential to a determination of guilt herein that Lowery should have been instrumental in each operation or in operation out of the St. Paul studios. While Lowery's activities could have been limited to the Minneapolis studio, the jury could well have found, as they undoubtedly did find, that he was aware of what was going on in the St. Paul studios also. In a somewhat similar situation, this court recently said in Koolish v. United States, 8 Cir., 1965, 340 F.2d 513, 525, certiorari denied, 85 S.Ct. 1805:

"We are fully satisfied from an examination of the tremendous record here that substantial evidence supports the jury finding that there was an overall conspiracy to defraud and to obtain money and property from the Kenny Foundation and its donors, that each of the appellants cooperated with the others and each knowingly joined in the conspiracy, and that use of the mails to defraud was established in furtherance of the overall objective. It is immaterial whether or not there were minor conspiracies or schemes inside the overall conspiracy to obtain money from the Kenny Foundation and its contributors through false and fraudulent pretenses, representations and promises and that some of the defendants participated in some of these inner or smaller schemes but not in all of them."

The situation is not at all unlike that confronting this court in Reistroffer v. United States, 8 Cir., 1958, 258 F.2d 379, 387:

"We find no error in the course followed by the Court. Where the scheme to defraud included making sales by means of certain false representations conveyed through salesmen, proof of the same misrepresentations being made at widely different places to different persons by numerous agents in the same period, tends to prove that the scheme existed and that the particular salesman was carrying it on. As in the case of a conspiracy in operation the acts and declarations of each participant are admissible against all. The record shows that the conditions on which the court permitted the testimony that would otherwise be hearsay to be considered by the jury were indicated by the court immediately through the inquiries made to the prosecutor; his replies; and the applicable law stated; reiterated constantly for the defendants; conceded by the prosecutor; and fully explained to the jury by the court in the instructions given."

The rule of Kotteakos v. United States, 1946, 328 U.S. 750, 66 S.Ct. 1239, 90 L. Ed. 1557, can be of no avail to Lowery here or to any of the other appellants. See United States v. Speed, D.C.D.C. 1948, 78 F.Supp. 366, at pages 368–369, and Hayes v. United States, 8 Cir., 1964, 329 F.2d 209, certiorari denied, Bennett v. United States, 377 U.S. 980, 84 S.Ct. 1883, 12 L.Ed.2d 748, and Isaacs v. United States, 8 Cir., 1962, 301 F.2d 706, certiorari denied, 371 U.S. 818, 83 S.Ct. 32, 9 L.Ed.2d 58.

Appellant Lowery also contends that the trial court erred in denying his motion for judgment of acquittal on the ground that the indictment was unconstitutionally vague. We do not find it so. A reading of the indictment fully apprised the appellants of the charges against them with sufficient clarity so as to enable them to prepare a defense thereto. Furthermore, we find the terms of the indictment sufficiently detailed

and clear so that any judgment returned thereon could be pleaded in bar of future prosecution for the same offenses. Rood v. United States, 8 Cir., 1965, 340 F.2d 506; Bailey v. United States, 10 Cir., 1965, 340 F.2d 602.

▉ Appellant Mueschke separately contends that the evidence is insufficient as a matter of law to sustain a finding that he knowingly joined or participated in any scheme to defraud. Appellant Mueschke would, first, ground this contention in a statement of the trial court in denying Mueschke's motion for judgment of acquittal or a new trial. Judge Nordbye at that time said:

"* * * The Court finds it difficult to differentiate as to the gravity and culpability of the operations of the defendants Schafer, Lowry, Schmidt and Eppert. As to Mueske, I place him in a somewhat different category."

He points also to the fact that Judge Nordbye described the participation in the alleged scheme of all of the appellants excepting only Mueschke.

A perusal of the transcript indicates that Mueschke like the other appellants conducted training sessions, instructing other employees as to selling along the lines planned. The record indicates that Mueschke himself participated in the selling of many dance contracts, such as the Hobby Club, Country Club and other contracts running into terms of years and that he estimated that he had sold approximately $50,000 worth of such contracts; that he attended the Kansas City convention where he was told, "Every student is renewable like a reserve bank account for the studio". His attitude in making sales was expressed in the statement, "Make them feel important by asking not for $500 but for $5,000." Mueschke was aware that students or victims were being "pressurized". Mueschke, whose studio name was "Conrad", participated in signing up a woman in her middle 70's for dance lessons costing $300. She was subsequently escalated into the Hobby Club Association at a cost of $1200. This woman, a widow,

had been an immigrant from Germany where her schooling was "Just like you learn to read * * * and some writing * * * nothing much education." She was nervous, unable to take lessons of an hour and could not dance. Mueschke also had some responsibility in connection with mailing literature. He was on the board for "approval tests". Mueschke was aware of the studio policy to tell the student that she would be judged on her dancing, yet testified:

"Q. What she was preparing to do on the test, was not what you knew she would be judged by?

"A. That's right, sir.

* * * * * *

"Q. * * * You didn't tell her the whole story, did you?

"A. No, sir."

Appellant Mueschke instructed Michael Meyer, another employee of the studio, with reference to the use of coercion in getting victims to sign contracts. Meyer was instructed to "* * * try everything in our power to keep the woman in the chair and without leaving the table or the desk themselves; in other words, maybe just by putting your hand around her shoulder or around the edge of their chair, and if they were going to get up or something, you would kind of gesture in your conversation and manner of speech of holding her in the chair." The foregoing and also very substantial additional testimony indicates that Mueschke's claim of insufficiency is poorly grounded. It may not be sustained.

▉ Appellants Mueschke and Kay Peterson claim as error the denial by the trial court of their offer to demonstrate before the jury how club dancing classes were taught. The matter of allowing the demonstration before the jury came well within the discretion of the trial judge. We find no abuse of such discretion in the denial.

▉ Appellant O'Grady, who was acquitted on count 1 but found guilty on counts 4 and 5, assigns as his first point of error the contention that the count letters were not established to be for the

purpose of executing the scheme to defraud. The mailings of the count letters in counts 4 and 5 were *after* the particular victim to whom the letters had been addressed had parted with all the money she expended at the dance studios. O'Grady cites and relies on Kann v. United States, 1944, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88, and Parr v. United States, 1960, 363 U.S. 370, 80 S.Ct. 1171, 4 L. Ed.2d 1277. Kann stands for the proposition that where the fraudulent scheme alleged, being one to obtain money, and the participants having obtained the money by cashing checks at banks, which thereupon became holders in due course, the subsequent mailings of the checks by the bank to the drawees were not "for the purpose of executing such scheme" within the meaning of the statute and the conviction could not be sustained. In Parr the defendants utilized a credit card to obtain gasoline and other service station products, doing so without authorization to use the credit card for their personal use. The mailings in that case consisted of invoices sent by the company to the School District from which the credit card had been obtained and whose credit was wrongfully used. The court held that the mailings were not an integral part of the scheme as planned and executed by the defendants and that it was completely immaterial to the defendants what the oil company did about collecting its bills. Neither case supports O'Grady's contention. Here the appellants were charged with an overall scheme beginning about January 1, 1957, to about May 20, 1962, to defraud students and prospective students of money. Among the students so named were the count victims of 4 and 5. In the instant case all of the various contract sales to students and prospective students were but parts of the overall or unitary scheme to defraud. In Adams v. United States, 5 Cir., 1963, 312 F.2d 137, the court in a somewhat similar situation stated at pages 139–140:

"Those two cases [Kann and Parr] cannot be taken as establishing the proposition that once a defendant has obtained that which he set out to obtain through fraudulent means, no *subsequent* mailing can form the basis of a prosecution under section 1341. Therefore, the fact that in the present case the mailing of the sales slip occurred only after each sale had been made, that is, after the appellant had received the goods involved in each transaction, does not in itself preclude prosecution under Sec. 1341. That is particularly true when we bear in mind that all of the various sales involved were but part of one unitary scheme, and that numerous mailings occurred before the scheme, taken as a whole, was consummated."

A recent case involving this question is United States v. Sampson, 1962, 371 U.S. 75, 83 S.Ct. 173, 9 L.Ed.2d 136. There defendants were indicted for mail fraud. They were associated with a nation-wide corporation whose reputed function was to enable businessmen to obtain loans and sell their businesses. The indictment charged that after salesmen had fraudulently obtained applications for such services and advance payments therefor, that thereafter the defendants mailed acceptances of such applications to the victims in order to "lull" them into believing that the services would be performed. The District Court dismissed the indictment on the ground that since the money had already been obtained before the acceptances were mailed, such mailings could not have been "for the purpose of executing" the fraudulent scheme. The Supreme Court reversed, distinguishing Kann and Parr, and saying at page 80 of 371 U.S., 83 S.Ct. at page 176:

"We are unable to find anything in either the Kann or the Parr case which suggests that the Court was laying down an automatic rule that a deliberate, planned use of the mails after the victims' money had been obtained can never be 'for the purpose of executing' the defendants' scheme. Rather the Court found only that under the facts in those cases the schemes had been fully executed before the mails were used. And

Court of Appeals decisions rendered both before and after Kann have followed the view that subsequent mailings can in some circumstances provide the basis for an indictment under the mail fraud statutes.

"Moreover, as pointed out above, the indictment in this case alleged that the defendants' scheme contemplated from the start the commission of fraudulent activities which were to be and actually were carried out both before and after the money was obtained from the victims."

See, also, this court's opinion in Butler v. United States, 8 Cir., 1963, 317 F.2d 249, 255.

■ O'Grady also attempts to make much of the fact "* * * that the scheme as proved, argued, and summarized by the court at no place contained any reference to the use of certificates being sent to other than *prospective* students. That the count victims in Counts IV and V were something other than 'prospective students' within the contemplation of Paragraph 10 of Count I of the indictment cannot be denied. Such certificates were never sent to students that had already been in the studio as had the count victims in Count IV and V." We are not impressed with the contention. The fact that the victims named in counts 4 and 5 had been students at the studio prior to receipt of the letters referred to in counts 4 and 5 does not prohibit them from again being considered as "prospective students" for a retread on their gullibility. We find O'Grady's contentions to be without substantial merit.

■ Appellant Schmidt, aside from incorporating by reference the error claims of the other appellants, cites one specific ground himself. Schmidt's contention is that it was error for the District Court to interrupt a jury's deliberations in a multiple defendant criminal case and give additional evidence bearing upon one defendant's limited association with an alleged criminal scheme to defraud. Background for the alleged "interruption" appears necessary.

This trial began on November 25, 1963, and concluded on January 27, 1964. After the jury had been in deliberation for some hours, they sent a message to the court to the effect that they wanted a copy of the indictment. The trial judge advised counsel of the request and at the same time suggested that it would be very helpful to the jury to have a list which would indicate the period when each of the defendants was employed at the studio; that he had intended including that in his charge but "I backed away from it because I was a little worried that my dates might be incorrect and that I would be getting into some difficulty in that regard, and I didn't do so." He suggested that the lawyers might agree. Mr. Wasserman, attorney for the defendant Gil Anthony, who was subsequently acquitted by the jury of all counts in the indictment, agreed with the court's suggestion. Counsel for various other defendants did not do so. Mr. Proctor, attorney for appellant Schmidt, who herein raises the issue, made no objection to the submission of dates but did have an objection regarding the indictment. He felt that the indictment should be submitted to the jury *in toto*. The trial court thereupon instructed the jury with reference to the dates that Gil Anthony had been employed at the studio, accompanying such information with a cautionary instruction. No exception was taken by Schmidt's counsel or by anyone else. Brief in support of Schmidt's claim states:

"Counsel is unable to find precedent for this action and therefore urges that because of the prejudice it generated it is firmly within the recognized principle of an 'irregularity in the proceedings.'"

Appellant argues:

"The prejudice this error caused within the minds of the jury is clear and unequivocal. The stipulated fact given in the manner it was and at the time it was caused it to stand naked and alone and with great, undue prominence. It was given without any instruction as to the count

letters or mailings, although they were the only element of the crime to which the stipulation had any bearing.

"Within the factual and circumstantial framework of this case, but one meaning could attach in the minds of the jury from this additional evidence. And that is that one defendant, either from guilt or from fear, wanted it known that he was associated with these other defendants for the shortest period of time. It must have clearly appeared to the jury that this stipulation was tantamount to a confession of the existence of a scheme by defendant Anthony, and furthermore, that the shocked silence and non-joinder of the other defendants indicated their apparent hope of escape from conviction by adding to the confusion in the mass of evidence."

We are unable to agree with appellant Schmidt. We can find no prejudice to him through the court's giving to the jury the dates of employment of the defendant Anthony. The court's statement to the attorneys that it might be helpful to the jury if after this long trial they could stipulate the dates of various employments was a helpful and very probably fruitful one. The fact that only one of the defendants saw fit to accept the suggestion does not make it prejudicial error as to the others. We consider the point frivolous.

Several attacks on the court's instructions to the jury have been made by various appellants. We have carefully considered the court's entire charge and find it completely accurate and fully adequate.

In these appeals, where there are seven separate appellants represented by six individual attorneys or law firms, there have been presented to the court many and varied claimed errors. We have carefully considered all of them, including those not specifically mentioned herein. We find none of them is meritorious. We further conclude from our appellate review of the record of this trial that the appellants were tried fairly by an ex-

perienced and able judge, before a considerate and attentive jury, and that substantial evidence justified their conviction.

Maclay R. Hyde, Donald K. Smith, Franklin Petri, Jr., and Frank E. Proctor, all attorneys of Minneapolis, Minnesota, were court-appointed and have represented indigent appellants herein at considerable sacrifice to themselves of time and effort, including trips from Minneapolis, Minnesota, to St. Louis, Missouri, for the purpose of personally appearing and arguing these cases. We express to these attorneys our thanks for their cooperation with this court and their careful and meticulous attention to the rights of their clients in these cases involving difficult questions and a very substantial record.

Affirmed.