Frank J. FABIAN, Appellant,

v.

UNITED STATES of America,
Appellee.

Joseph E. FABIAN, Appellant,

v.

UNITED STATES of America,
Appellee.

Robert P. SZALAY, Appellant,

v.

UNITED STATES of America,
Appellee.

Nos. 17889, 17891.

United States Court of Appeals
Eighth Circuit.

March 28, 1966.

George O. Kanouff, Omaha, Neb., made argument for appellants and filed type-written brief with Richard C. Sheridan, Omaha, Neb.

Jerry E. Williams, Asst. U. S. Atty., Des Moines, Iowa, made argument for appellee and filed brief with Philip T. Riley, former U. S. Atty.

Before MATTHES and GIBSON, Circuit Judges, and LARSON, District Judge.

LARSON, District Judge.

These are appeals from convictions by a jury on 16 Counts of mail fraud, 18 U.S.C. § 1341. Counts 2, 3, and 14 of the 19 Count indictment were not submitted to the jury. The scheme upon which the convictions are based was the sale of stereo sets on a chain referral system in the Des Moines, Iowa, area. Appellants now seek reversal of their convictions, based on these contentions:

 1. The jury should have been released following a prejudicial statement made by a member of the panel from which they were selected;

 2. The trial court erred in admitting testimony of oral statements made by Concordia salesmen;

 3. The Government's evidence was cumulative, repetitious, and provoked jury passion and prejudice;

 4. Instruction Number 12 was erroneous; and

 5. The lower court erred in denying appellants' motions for a directed verdict.

In the summer of 1962 appellant Frank Fabian, a 38 year old high school graduate, and his brother, appellant Joseph Fabian, a 27 year old college student, sold stereo sets for Concerto, Inc., in Omaha, Nebraska, on a part-time basis. Concerto used the referral system, described below, and the Fabians worked for commissions, usually receiving $50.00 per set. While vacationing in Omaha that summer appellant Robert Szalay, a 23 year old nephew of the Fabians, accompanied them on sales demonstrations. During that period the Fabians discussed the possibility of forming their own business and their nephew, if not an active participant, was present during some discussions. Although Szalay returned to his home in Dearborn, Michigan, at the end of the summer, communications were maintained. In the early fall of 1962 the Fabians definitely determined to set up a sales program in another city similar to that used by Concerto in Omaha, and Robert Szalay decided to join the venture, contributing some capital. Additional funds were advanced by Joseph Fabian and a brother not involved in this case.

Appellants then established Concordia, Inc., as a Nebraska corporation. Frank was president; Joseph, vice president; and Robert Szalay was secretary-treasurer. On October 1, 1962, the corporation was authorized to do business in the State of Iowa. A sales tax permit was secured on November 28, 1962, and appellants posted a cash bond of $500.00. Office space was obtained in Des Moines under a one year lease, commencing September 22, 1962, and bank accounts in the name of Concordia, Inc., were opened with a Des Moines bank. Membership in the Credit Bureau of Des Moines was established in October of 1962. Arrangements were made to obtain stereo sets from Muntz T. V. Inc. of Illinois at a cost to appellants ranging from $98.00 to $149.00, depending upon the model and finish. However, most of the 65 sets purchased from Muntz were in the wholesale price range of $98.00 to $103.00, plus freight. Appellants contacted several finance companies and Consumers Finance Corporation finally agreed to purchase the Concordia sales contracts.

The method of marketing the sets in Des Moines was, in essence, a carbon copy of the Concerto sales plan in Omaha. Each stereo purchaser would receive an "Owner's Dividend Certificate" which provided that $15.00 would be paid for the name of each prospective customer (subject to credit qualifications), who agreed to a sales demonstration, regardless of whether a sale resulted. In addition, the prospective customer would receive $5.00 merely for listening to the sales presentation, which was not contingent upon the purchase of a set. Customers were informed that they could earn a set by referring twenty-six names, which could be submitted over a two year period. Most purchasers understood that there was no limit to the number of names they were allowed to refer, so that all referrals over twenty-six would result in profit. The referral plan was represented as a substitute for expensive advertising and a means of introducing the

190

product to the community. Also, customers were told that the sets would later be sold through a retail outlet which appellants, or Concordia, planned to establish. Most customers understood that the referral plan had operated in other cities, such as Omaha and Lincoln, and many had the impression that these operations were quite successful.

The stereos were generally sold on an installment contract for $389.95, plus interest and carrying charges. These contracts were assigned to Consumer's Finance Corporation, which deducted a discount and paid the balance to Concordia. Purchasers were to make payments directly to the finance company, although some testified that they were not informed of this at the time they purchased the set, nor were they told about the interest and carrying charges added to the purchase price. With the addition of these charges, the total price of the set was approximately $485.00.

Initially appellants demonstrated the stereos, but they soon hired several salesmen, a number of whom were stereo purchasers who worked only part time. Among the salesmen was Don Knight, who had previously sold for Concerto in Omaha during the same interval that the Fabians were connected with that organization. Subsequent thereto, but before going to Des Moines, he took over a referral program involving Muntz stereos in Lincoln, Nebraska. That business was unable to honor the referrals and in mid-November, 1962, Knight came to Des Moines and was hired as a salesman for Concordia, receiving a commission of $60.00 a set, which was $10 more than the other salesmen received.

About the same time Muntz T. V. informed appellants that they would no longer sell stereos to Concordia. The Muntz sales manager indicated that this action was taken because the product was being sold in connection with a "gimmick" and because the price was exorbitant. He testified that the retail value of the stereos was $200.00. In addition, the Muntz representative informed the Fabians that a referral plan in Lincoln,

with whom Muntz had been doing business, received adverse publicity which caused the company to become concerned about appellants' operation in Des Moines. The last set which Muntz sold to appellants was on November 20, 1962. Thereafter, Concordia obtained the same Muntz model from other sources, the majority at a wholesale cost higher than the Muntz price.

In December, 1962, Concordia began receiving complaints that appointments were not kept with the referrals. The office girl informed the callers that Concordia had attempted to contact them to reschedule some of these appointments since they had more than they could cope with, and that the salesmen were having difficulties in making all of the calls because of the severe weather. Complaints were also received concerning the $15.00 referral payments and customers were informed that there were so many to complete that it was impossible to adhere to the payment schedule. They were also told that the person with authority to sign checks was out of town. In addition to the complaints directed to Concordia, complaints were lodged with the Better Business Bureau. Shortly after appellants arrived in Des Moines, they had contacted the Bureau, leaving a phone number and address. After receiving a number of complaints, some beginning in the fall of 1962, a Bureau representative held a conference with the Fabians on January 16, 1963, and was promised complete cooperation in eliminating the problems. About a month later, on February 25, 1963, the business was abandoned, although no arrangements had been made concerning demonstration appointments and referral payments. Frank Fabian returned to Omaha; Joseph Fabian had already left in the latter part of January to resume his college work; Robert Szalay, after cleaning out the office, subsequently went back to Michigan.

*Jury Prejudice—*

During selection of the jury a member of the panel made a statement to the effect that as a juror in another mail fraud case he suggested that defendant

be found guilty so the jury could watch the World Series.[1] Thereafter, counsel for both sides conferred with the trial judge in chambers and it was determined that appellants would be granted an additional peremptory challenge. When this juror was called, the trial judge excused him for cause. However, it is now suggested that the court should have dismissed the entire panel for cause or should have taken evidence to determine exactly what the prospective juror said and whether or not other members of the panel heard the statement.

 "The right to challenge the panel or to challenge a particular juror may be waived, and in fact is waived by failure to seasonably object." Batsell v. United States, 217 F.2d 257 (8th Cir. 1954). In our opinion, that right was waived here. Appellants concede that no objection was made to the course followed by the trial judge. If dissatisfied with that procedure, the objection could have been noted. Appellants neither moved for a mistrial,[2] nor did they present a motion to dismiss the panel. On voir dire, the panel might have been examined about the incident and, if appropriate, individual members might have been challenged for cause. None of these alternatives was chosen. Although there *may have* been prejudice here, appellants would have us reverse the convictions, and remand for a new trial on the assumption that the jury *actually was* so prejudiced that a fair trial was impossible. But the rule is otherwise —jury prejudice cannot be presumed, and appellants have the burden of showing its existence. Beck v. Washington, 369 U.S. 541, 558, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962). It rested with appellants to request a hearing and produce evidence to determine which jurors heard the statement and the effect it might have had. Cf. Frazier v. United States, 335 U.S. 497, 69 S.Ct. 201, 93 L.Ed. 187 (1948); United States v. Gordon, 253 F.2d 177, 184 (7th Cir. 1958). This was not done here, and we are satisfied that the remedy provided by the court was adequate, in the absence of any objection by appellants.

*Salesmen's Statements—*

██ Appellants contend that admission of testimony concerning oral representations by Concordia salesmen was improper because (a) the record contains no evidence of a scheme to defraud; and (b) no proper foundation was laid for such testimony. The first argument is based on the rule that salesmen's oral statements, out of appellants' presence, would not be binding on them unless there was independent evidence of a scheme to defraud in which appellants participated. Friedman v. United States, 347 F.2d 697 (8th Cir. 1965); Reistroffer v. United States, 258 F.2d 379 (8th Cir. 1958), cert. denied, 358 U.S. 927, 79 S.Ct. 313, 13 L.Ed.2d 301, rehearing denied, 361 U.S. 856, 80 S.Ct. 42, 4 L.Ed.2d 96 (1959); Schaefer v. United States, 265 F.2d 750 (8th Cir. 1959), cert. denied, 361 U.S. 844, 80 S.Ct. 97, 4 L.Ed.2d 82 (1959). Disregarding the challenged testimony—as we must for purposes of determining its admissibility—the record warrants the conclusion that appellants did formulate and participate in a scheme, which was advanced by the oral statements of Concordia salesmen. It was appellants who determined to introduce the referral program to Des Moines; it was they who adopted and adapted the Concerto "Owner's Dividend Certificate" for use by Concordia. Their active participation in the plan is evidenced by the efforts to obtain stereo sets and their actual demonstration and sale of the sets. That the salesmen were essential in furthering the plan is shown by the training sessions conducted by appellants. Moreover, the testimony of appellants themselves demonstrates substantial consistency between the oral representations of

---

1. Counsel advise us that the 1964 World Series was being played at the time of the trial in this case.

2. Affidavits of trial counsel for the Government and for appellants are conflicting as to whether the trial judge suggested, or offered, appellants a mistrial.

salesmen and the instructions they received.[3] From this independent evidence, and considering the record in its entirety, it must be concluded that the testimony objected to was admissible, and binding upon appellants.

The second phase of the challenge to this evidence relates to the order of proof. The argument is that the statements were admitted at a point when no foundation evidence had been adduced to connect appellants with a scheme to defraud. The contention that this showing was necessary *before* the testimony was admitted is answered by Reistroffer v. United States, supra. In that case, also a mail fraud action, the trial court admitted evidence of salesmen's oral statements outside the defendants' presence, subject to later proof connecting defendants with a scheme to defraud. A limiting instruction was given at the close of the evidence advising the jury to disregard this testimony unless they found by independent evidence that defendants had devised or participated in a scheme to defraud. We approved that procedure, noting that the record did contain such independent evidence. The trial court here adopted a similar procedure, giving a cautionary instruction after an objection was interposed. Although appellants' trial counsel indicated approval of the instruction, it is now contended that no proper foundation was laid, relying on the following language in Beck v. United States, 305 F.2d 595 (10th Cir.), cert. denied, 371 U.S. 890, 83 S.Ct. 186, 9 L.Ed.2d 123 (1962).

"It is agreed the general rule permits the admission of such statements, if they have been expressly or impliedly authorized, or have been ratified by the person against whom they are offered. * * * The authority to render such statements admissible may be found in the circumstances of the particular case, in the scope of the plan or scheme or from other pertinent facts. *A proper foundation must*

*always be laid.*" 305 F.2d at 600. (Emphasis added.)

Appellants apparently read the italicized language to mean that the foundation must be laid before the testimony is admitted. Our decision in *Reistroffer* indicates the contrary and that decision was relied upon in *Beck* and recently quoted with approval in Friedman v. United States, supra, 347 F.2d at 708. The foundation may be laid, and the testimony rendered admissible, by subsequent proof. If that later proof shows, as it did here, that the defendants against whom the evidence is offered, did formulate and participate in a scheme to defraud, and the salesmen's statements were in furtherance of that scheme, then a proper foundation has been laid. The problem here is not unlike that which arises in conspiracy cases in which the declarations of an alleged conspirator are offered against an alleged co-conspirator, who was not present when the statements were uttered. In that type of case we have held it to be discretionary with the trial judge whether to admit the evidence subject to later proof of the existence of a conspiracy. See Rizzo v. United States, 304 F.2d 810 (8th Cir.), cert. denied, 371 U.S. 890, 83 S.Ct. 188, 9 L.Ed.2d 123 (1962); Cwach v. United States, 212 F.2d 520 (8th Cir. 1954). The order of proof rests largely in the discretion of the trial judge and we cannot say this discretion has been abused here.

*Cumulative Evidence—*

Appellants complain that forty-four stereo purchasers were called as witnesses by the Government. They contend that the testimony was repetitious and by pure volume served to prejudice and impassion the jury. It is argued that actual passion and prejudice can be found in the fact that the jury reached a verdict in less than one hour.

The Government had the burden of showing a scheme to defraud and

---

3. Appellants testified that they gave no instructions to Don Knight or Frank Fisher, both of whom had worked for the Concerto organization in Omaha and Lincoln. It was assumed by appellants that these salesmen were familiar with the set and the referral plan.

"a 'scheme' involves some connotation of planning and pattern * * *." United States v. Ross, 321 F.2d 61, 68 (2d Cir.); cert. denied, 375 U.S. 894, 84 S.Ct. 170, 11 L.Ed.2d 123 (1963). To demonstrate this pattern it may perhaps be necessary to call more witnesses than would be required in other types of cases. It is within the discretion of the trial judge to regulate the course of trial, and the record here does not suggest that this discretion was abused. Moreover, there is no indication that appellants objected to the Government's evidence as being repetitious and cumulative.

 The contention that a verdict reached within one hour must be based on jury prejudice, attributable to the number of witnesses, is untenable. A similar argument was advanced, and rejected, in Greenhill v. United States, 298 F.2d 405 (5th Cir. 1962), cert. denied, 372 U.S. 968, 83 S.Ct. 1092, 10 L.Ed.2d 130, rehearing denied, 373 U.S. 947, 83 S.Ct. 1536, 10 L.Ed.2d 703 (1963), in which the jury returned a verdict within one hour on nine counts of mail fraud and ten counts of fraud in the sale of securities. The scheme involved in the instant case was not particularly complex, and we cannot assume that the jury failed to consider all of the testimony and exhibits.

*Instruction Number 12—*

 In this instruction the Court mentioned evidence concerning the alleged participation of appellants Fabian in the Concerto operations in Omaha and Lincoln, Nebraska.[4] The Fabians take exception to this charge on the ground that there was no evidence that they ever worked in Lincoln or had any connection with that organization. While the record does contain several references to Lincoln, there is no indication that the Fabians actually participated in, or had any interest in, the sales program conducted there. Nonetheless, in the context of the entire trial, we think the instruction was harmless. It was clear in its admonition that evidence about the referral plan in Lincoln should be considered solely in relation to the knowledge, intent, or purpose of appellants Fabian. The record does show that the Fabians were at least aware of the existence of this operation, and it might have been inferred that they also knew of its downfall. The jury was entitled to consider the bearing this knowledge had on their purpose and intent. As so limited, Instruction Number 12 was proper.

*Motions for Directed Verdict—*

Upon completion of the Government's case in chief, appellants moved for a dismissal and directed verdict. The motion was overruled, but was renewed at the close of all the evidence, and was again denied. Viewing the evidence as insufficient to sustain their convictions, appellants find error in these rulings.

 The components of an offense under the mail fraud statute are: (1) the existence of a scheme, or the making of false representations and promises, (2) for the purpose of obtaining money or for defrauding, (3) furthered by the use of the mails. Gold v. United States, 350 F.2d 953 (8th Cir. 1965); Beck v. United States, supra. No question is presented here as to the use of the mails.[5]

---

4. The last paragraph of Instruction No. 12, which is the focus of the objection, reads as follows:

The government presented evidence as to alleged transactions participated in by the defendants, Frank J. Fabian and Joseph E. Fabian, which occurred in the Omaha and Lincoln, Nebraska areas in connection with an organization known as Concerto Inc. You may consider such evidence for whatever bearing, if any, it may have as to the knowledge, intent, or purpose of each of these two said defendants in the matters charged in the indictment. You may not consider, however, that such evidence is proof of the crimes charged in the indictment. Such evidence was received and may be considered by you for the limited purpose of bearing on the question of intent of each of these two said defendants to commit the crimes charged in the indictment.

5. Referral payments were sent through the mail and some purchasers received letters extending a "welcome" into the Concordia "family" of stereo purchasers.

Turning, then, to the first element, it is apparent that a scheme—i. e., a plan and a pattern—did exist. Appellants themselves testified that before leaving Omaha for Des Moines they discussed the method of selling and calculated anticipated expenses and profits. Thus they arrived in Des Moines with a plan and they proceeded in accordance thereto. That the referral sales of stereo sets was not on an isolated, ad hoc, basis, but constituted a pattern is indicated by the virtually identical testimony of many purchasers.

Among the representations made by appellants and the salesmen, claimed to be false by the Government, were (a) that the stereo had a diamond needle, (b) that only twenty-six referrals were necessary to earn the set, and (c) that this method of selling had operated successfully in other cities. The evidence shows that, in fact, the needle was sapphire and not diamond. The record also shows that in fact more than twenty-six referrals were necessary to completely pay for a set. The representation concerning successful operations in other cities also was false, as least insofar as Lincoln, Nebraska. Other false or misleading representations include the failure to inform some purchasers that interest and carrying charges would be added to the purchase price and that the installment contracts would be assigned to Consumers Finance. In addition, we have the contrived explanations concerning non-receipt of referral payments.

The crucial element, from appellants' standpoint, is the second one—purpose or intent to defraud. The crux of the defense was that they acted in complete good faith, and through inexperience they innocently, but mistakenly, thought the referral plan could succeed. The false representations, described above, constitute one basis from which the Gov-

ernment derives fraudulent intent, but the principal reliance is on the patent impossibility of the scheme, which, it is argued, should have been perfectly obvious to persons of appellants' age, education, and background.

On the other hand, appellants point out that they began by obtaining authority to do business in Iowa; applying for a sales tax permit and posting a bond; and registering with the Better Business Bureau. With reference to the misrepresentation about the diamond needle, they explain that it was so small that it was impossible for anyone to ascertain that it was not diamond, and that after reading a Muntz brochure about the set and learning that the needle was sapphire, customers were so informed. Appellants showed that twenty-six referrals at $15.00 each would cover the price of the set, exclusive of interest and carrying charges. They also point out that a few purchasers received enough referral payments to completely earn their sets, and others even made a profit. Appellants maintain that they were not aware that difficulties of the Concerto organization in Lincoln were caused by the inability to make referral payments. Appellants were convinced, or so they testified, that the referral plan would be successful. A $600.-00 personal loan obtained by Joe Fabian is cited as evidence that appellants attempted to honor their commitments under the referral program. There was also testimony tending to show appellants intended to use this method of selling as a short term, introductory approach, preliminary to opening a retail establishment.[6]

▮▮▮▮ From the foregoing summary, it seems clear there was evidence from which the jury might infer the existence of fraudulent intent, as well

6. The referral plan cannot succeed even if used for only a short time unless at some point customers subsequent to the first one are not allowed to earn the set. As the Government brought out at the trial, once the plan is set in motion, the referrals spiral due to the principle of geometric progression. If each person who purchases a set can earn it by referring names, no profit will be made; hence, no funds would be available to satisfy referral commitments. The only method of halting the progression is to withhold the referral privilege for customers who were obtained by referral.

as the lack thereof. It is not our province to choose between conflicting evidence, or to determine the inferences which should be drawn therefrom. What was said in Beck v. United States, supra, is pertinent here:

"Fraud or the existence of a fraudulent scheme is seldom susceptible to proof solely by direct evidence and in nearly every such case, direct and circumstantial evidence together with the inferences to be drawn therefrom must be relied upon for proof. On the face of the business operation involved here, it may be argued that it was merely a legitimate business venture that did not work out successfully. That, however, was a question of fact, to be determined by the jury after considering all of the evidence and the inferences to be drawn therefrom." 305 F.2d at 598.

Here the jury resolved the conflict between the circumstances tending to show intent to defraud and that tending to show good faith, in favor of the former. We must assess the evidence in a light most favorable to upholding the jury's verdict, and resolve all reasonable inferences in favor of the Government. Friedman v. United States, 347 F.2d 697 (8th Cir. 1965) ; Koolish v. United States, 340 F.2d 513 (8th Cir. 1965). Judged from this view, we cannot say, as a matter of law, that the evidence does not support the verdict. Accordingly, we find that the trial court did not err in overruling the motions for a directed verdict.

Upon reviewing the record, with appellants' arguments in mind, we conclude that they received a fair trial, free from reversible error. The judgments of conviction must be affirmed.[7]

---

7. Frank and Joseph Fabian were sentenced to three years imprisonment on all counts —except Count 19—the sentences to run concurrently. However, it was recommended that these appellants be eligible for parole after six months. As to Count 19, they were placed on probation for three years, said sentence to run consecutively with that imposed on the other counts. Appellant Robert Szalay was given a suspended sentence under the Youth Correction Act and placed on probation for three years. A condition of probation for each appellant was payment of one-third of the costs. Although we affirm the convictions, we concur in the recommendation for early parole.